IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

KESIA J. PERRY, VALENCIA AARON,  )
and STACY D. TAYLOR,             )
                                 )
            Plaintiffs,          )
                                 )
v.                               )  CIVIL ACTION NO. 2:11-cv-464-WHA
                                 )           (WO)
ALABAMA ALCOHOLIC BEVERAGE       )
CONTROL BOARD, JEFF ROGERS,      )
in his individual capacity, and JEAN  )
TURNER, in her individual capacity,   )
                                 )
            Defendants.          )

**MEMORANDUM OPINION AND ORDER**

I.      **INTRODUCTION**

        This case is before the court on three Motions for Summary Judgment filed by

Defendants Alabama Alcoholic Beverage Control Board ("ABC Board" or "Board"), Jeff

Rogers, and Jean Turner on June 28, 2013. The Plaintiff, Kesia Perry ("Perry"), filed a

Complaint in this case on June 14, 2011, bringing claims against the ABC Board and against Jeff

Rogers ("Rogers") and Stan Goolsby ("Goolsby") in their individual capacities. Perry amended

her Complaint to add Valencia Aaron ("Aaron") as a plaintiff and Kenneth Davis ("Davis"), in

his individual capacity, as a defendant. A Second Amended Complaint (Doc. #6) was then filed

on June 30, 2011, adding Stacy Taylor ("Taylor") as a plaintiff and Jean Turner ("Turner"), in her individual capacity, as a defendant. In response to the Second Amended Complaint, the Defendants filed a Motion to Dismiss (Doc. # 18), which the court granted in part and denied in part, resulting in the dismissal of some of the plaintiffs' claims and Goolsby and Davis as defendants (Doc. #26). The remaining claims are: Count I – Perry's race discrimination and hostile environment claims against the ABC Board for violation of 42 U.S.C. § 2000e-2(a)(1) ("Title VII"); Count II – Perry's retaliation claim against the ABC Board for violation of Title VII; Count V – Aaron's race discrimination and hostile environment claims against the ABC Board for violation of Title VII; Count VI – Aaron's retaliation claim against the ABC Board for violation of Title VII; Count IX – Taylor's race discrimination and hostile environment claims against the ABC Board for violation of Title VII; Count X – Taylor's retaliation claim against the ABC Board for violation of Title VII; Count XI – Taylor's race discrimination and harassment claim against Rogers and Turner for violation of the Fourteenth Amendment and 42 U.S.C. § 1981; and Count XII – Taylor's retaliation claim against Rogers and Turner for violation of 42 U.S.C. § 1981. The case is now before the court on three separate Motions for Summary Judgment filed by the Board and by the individual Defendants. They seek summary judgment on all remaining counts.

The court has federal question subject matter jurisdiction over these claims. *See* 28 U.S.C. § 1331.

For the reasons to be discussed, the Defendants' Motions for Summary Judgment are due to be **GRANTED**.

## II.   SUMMARY JUDGMENT STANDARD

Summary judgment is proper "if there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (quotation omitted).

The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion," relying on submissions "which it believes demonstrate the absence of a genuine issue of material fact." *Id.* at 323. Once the moving party has met its burden, the nonmoving party must "go beyond the pleadings" and show that there is a genuine issue for trial. *Id.* at 324.

Both the party "asserting that a fact cannot be," and a party asserting that a fact is genuinely disputed, must support their assertions by "citing to particular parts of materials in the record," or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A), (B). Acceptable materials under Rule 56(c)(1)(A) include "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials."

To avoid summary judgment, the nonmoving party "must do more than show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). On the other hand, the evidence of the non-movant must be believed and all justifiable inferences must be drawn in its favor. *See Anderson v. Liberty Lobby*, 477 U.S. 242, 255 (1986).

After the nonmoving party has responded to the motion for summary judgment, the court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a).

### III.   FACTS

Based on submissions of the parties, the following is an account of the relevant facts with all justifiable inferences drawn in favor of the Plaintiffs:

#### The ABC Board's Policies and Personnel Process

The Plaintiffs in this case were employees of the ABC Board. As an agency of the State of Alabama, the ABC Board is subject to the rules and regulations of the State Personnel Department ("SPD"). Both the SPD and the ABC Board have policies that prohibit discrimination against any employee or applicant based on race. The ABC Board's policy states that any employee or applicant may file a discrimination complaint with the ABC Board. The ABC Board also has a policy that requires employees to testify as needed in conjunction with pre-discipline or grievance hearings. Any employee that refuses to testify or that harasses another employee may be subject to discipline, including dismissal.

The SPD manages the recruitment and testing procedures for all of the ABC Board's merit-system jobs. A candidate seeking a job or a promotion must first submit an application for examination with the SPD. If the candidate meets the job classification's minimum qualifications, the SPD either administers an examination or scores the candidate based on

experience. The SPD then prioritizes the candidate's name on the job classification's hiring/promotion register according to the candidate's score.

When the ABC Board has a job vacancy, the SPD provides the ABC Board with a Certificate of Eligibles, made up of the top ten names, plus ties, from the hiring register. A candidate may remove himself or herself from the register for any reason. In addition, a candidate may be removed if he or she has noted a restriction, such as an unwillingness to move to a particular geographic location.

To be eligible to receive a promotion, a candidate must 1) rank in the top ten, plus ties, of the hiring register, 2) rank in the top half of the register and successfully perform the current job classification at a higher level for more than three months (the "Upper 50 Rule"), or, 3) having been unable to be in the top ten, plus ties, or the upper fifty percent of the register, perform the job at a particular level for five years or more (the "Five Year Rule"). For promotion through the Upper 50 Rule or the Five Year Rule, the employee's position is analyzed for reallocation. For reallocations, the ABC Board submits a position classification questionnaire to the SPD's Classification and Pay Division Manager. Using the questionnaire, the manager then decides whether reallocation is warranted for the particular position. If the questionnaire is insufficient, the SPD may require a desk audit to observe the job personally in making its decision. Ultimately, the SPD's Classification and Pay Division Manager makes the reallocation decision. If reallocation is warranted, the employee is promoted to a higher classification. If reallocation is unwarranted, the employee remains at his or her current classification.

When an employee is hired, his or her salary is usually set at the minimum for the specified job classification. In special cases when it is deemed impossible to hire a desired qualified person at the minimum rate, the ABC Board may recommend—and the SPD

Classification and Pay Division Manager may approve—a higher rate that matches the person's salary from his or her previous employment.

<u>Plaintiff Kesia Perry</u>

Plaintiff Perry, an African-American, was hired by the ABC Board on August 1, 2007 as an Administrative Support Assistant II ("ASA II"), a position classified as responsible for filing and retrieving documents and answering the telephone. After completing her probationary period, she was assigned the duties of handling labels and sweepstakes authorization. Perry consistently received excellent performance reviews, but, due to a merit raise freeze, she did not receive a raise after her initial probationary period. After several months working as an ASA II, Perry requested the opportunity to be promoted to an ASA III. Perry took the examination to qualify for promotion and scored in Band 3. Based on this score, the SPD prioritized Perry in the top half of candidates on the ASA III promotional register, but her score did not warrant placing her in the top ten, plus ties.

In June 2008, the Chief of the Enforcement Division, Defendant Rogers, white, requested a reallocation of Perry's position. After reviewing the classification questionnaire and in order to get more information, SPD sent a job analyst to perform a desk audit of Perry's position. In a letter dated July 3, 2008, SPD notified the ABC Board of its decision not to reallocate Perry's position. Specifically, the SPD stated that Perry's job lacked the independent judgment and level of responsibility of an ASA III. Mark Hatfield ("Hatfield"), the Enforcement Division Lieutenant and Perry's second-line supervisor, communicated the SPD's decision to Perry. During this discussion, he also told her that she took too many personal phone calls at work. In a subsequent

6

memo, the contents of which Perry disputes, Hatfield wrote that Perry became visibly angry over the SPD's decision and over Hatfield's criticism of her work habits. He also noted that Perry argued about her number of personal calls, stating that every ASA took the same number of personal calls as she did. A few months later, in November 2008, Perry received high scores on a performance appraisal prepared by Diane Sullivan ("Sullivan"), Perry's direct supervisor.

In July 2009, Hatfield sent the Enforcement Division a memo regarding the chain of command. On the same day, Sullivan sent Hatfield a memo recapitulating a meeting between herself, Hatfield, and Perry. The memo noted that Perry complained of some coworkers' "racist attitude" toward her. Perry did not mention a specific individual in the meeting, and Hatfield instructed her to report immediately any further racist conduct. In September 2009, Hatfield prepared another memo describing a conversation with Perry about what she needed to do to be promoted. In that memo, Hatfield wrote that Perry informed him that she no longer wished to be promoted and that she would not take another ASA III examination. In October 2009, Sullivan also wrote a memo describing a conversation she had with Perry concerning a promotion. In that memo, Sullivan noted that Perry no longer wished to be promoted, that she would not retake the examination, and that she wished her new assignments to be taken back. Perry disputes the content of both memos, but it is undisputed that she never retook the examination. Perry also contends that, although Hatfield told her she needed to rank in Band 1 of the register to receive a promotion, this information was incorrect because she was eligible for promotion through the Upper 50 Rule. In November 2009, Sullivan again gave Perry high scores on her performance appraisal, noting that Perry had been assigned additional duties and was performing them competently.

Early in 2010, Sullivan announced her retirement and Perry asked Hatfield and Rogers if she could be cross-trained for Sullivan's position. Soon after, Rogers requested another ASA II through the SPD. Ultimately, the vacancy was filled by Rogers' sister-in-law, Summer Childers ("Childers"), a white woman. Childers did not negotiate her salary, but the ABC Board requested that the SPD match Childers' salary from her previous job with Colonial Bank. Perry argues that Childers was thereafter assigned many of Sullivan's duties despite Perry's request for cross-training. Hatfield, however, testified that Sullivan's duties were either automated or distributed to district lieutenants.

A few months after Childers was hired, Perry and Linda Flores ("Flores"), a white coworker, reviewed their coworkers' salaries online. Through their review, they learned that Childers' pay was more than twice Perry's pay and that Childers' pay was near the maximum allowable for an ASA II. Early in May 2010, Perry complained to Goolsby and Rogers about the pay discrepancy. At that time, Goolsby explained that the discrepancy was based on the salary-matching policy. Afterwards, Rogers told Hatfield to address Perry and Flores's review of their coworkers' salaries. Hatfield counseled Perry, thus deciding not to discipline her formally. Flores, on the other hand, was issued a written warning—the first step of the progressive discipline policy.

A few weeks later, Rogers told Perry that she was being transferred to the District 10 office. The transfer appears to have been Hatfield's idea, purportedly suggested as a means to position Perry for a promotion through more diverse and numerous job responsibilities. Perry told her supervisors that she did not want to be transferred from the Central Office, but that she would accept the transfer and do her best with the new assignment. Even though Rogers said that the transfer was not punitive, he later wrote in an email requesting internet usage reports that he

had transferred Perry because of a "disgruntled/disciplinary issue." (Pl. Ex. 22 at 1.) Once Perry was transferred, the possibility of promotion was never mentioned to her.

Perry began dating Andy Lard ("Lard"), another African-American ABC Board employee, in 2010. Lard was investigated and eventually arrested and indicted for taking seized money from evidence. As part of the investigation, Perry was interrogated about her relationship with Lard. Rogers sent an email to the entire enforcement division that instructed employees not to speak to Lard, and Perry was asked to sign a document stating that she would not remove documents from the ABC Board's offices. Perry bailed Lard out of jail when he was arrested. Perry believed that she was being followed during this period and that the investigation into her relationship with Lard was racially motivated. Due to the investigation, she says she became overwhelmed with stress and, on advice of her physician, she took medical leave on August 9, 2010.

On August 9, 2010, the same day that she took medical leave, Perry filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"). In her charge, she complained of race discrimination comprised of Childers' higher pay, the involuntary transfer to District 10, and the perceived harassment related to Lard. Perry also filed a grievance with SPD, asserting racial discrimination comprised of the involuntary transfer to District 10 in retaliation for complaining about the pay disparity. In this grievance, Perry alleged that employees did not communicate their complaints to supervisors because they were afraid of retaliation or termination. In addition, Perry stated that she expected to be retaliated against because of the discriminatory atmosphere at the ABC Board.

Perry's medical leave lasted until November 2010. When she returned to work, she was transferred from District 10 to the Personnel Division at the Central Office. Goolsby became her

direct supervisor. Her position was classified as satisfying either an ASA I or ASA II level. Soon after Perry began working again, the newly appointed ABC Administrator Mac Gipson ("Gipson"), who replaced Emory Folmar ("Folmar"), met with Perry and encouraged her to drop her claims.

Perry filed her initial complaint in this case in June 2011. Beginning in July 2011, Perry worked under Andy Knight ("Knight"). Knight had not supervised an employee for several years. Nevertheless, Goolsby assigned Perry as Knight's sole subordinate, stating that, due to Perry's claims, he needed a buffer and that any actions Goolsby took could be deemed retaliatory. He instructed Knight to keep a close watch on Perry and to use progressive discipline if necessary; Knight testified in his deposition that Goolsby stated that "[Perry] would either hang herself or she would become so upset that she would quit." (Pl. Ex. J at 22:19–22.)

Under Knight, Perry was responsible for working the switchboard and ensuring it was properly staffed during breaks. Knight testified that communication problems between Perry and her back-up switchboard operators led to instances where the switchboard was not manned. As a result, Knight held a counseling session with Perry to discuss punctuality, cooperation with coworkers, and compliance with the rules. Perry complained to Knight that her coworker, Linda Caldwell ("Caldwell"), was difficult to work with and did not man the switchboard at the correct time. Knight told Perry that he was not Caldwell's supervisor but that he had been speaking with Caldwell's supervisor about the issue. Caldwell continued to cause problems for Perry, and Perry testified that she ultimately lost interest in her position as a result.

During the course of her supervision under, first, Goolsby and, second, Knight, Perry received two disciplinary actions: a written reprimand for tardiness and insubordination and a suspension for violating leave policies and procedures. Very soon after Knight became Perry's

supervisor, Goolsby recommended Knight issue the reprimand. Perry had called Goolsby and said she would not be on time for work: her father had recently had a heart attack and she needed to oversee transferring him to a new medical center. Perry was issued a reprimand for the stated reason that she did not request authorization to be tardy.

On Knight's recommendation, Perry was suspended from work for three days in January 2012 after failing to comply with the policies regarding leave. Perry was absent several days over December 29, 2011 through January 5, 2012, causing Knight to have to personally fill in for her.

Before Perry left for her suspension, Knight asked her to draft a staffing schedule for the switchboard for the days she would be absent. Perry did not complete the task before her suspension. Knight characterized this behavior as insubordination, and when Perry returned on January 18, 2011, she explained that she forgot to do it. After discussing the matter with Knight, Perry briefly returned to her work station before walking off the job that morning. A few days later, Goolsby sent Perry a letter stating that Perry's actions constituted job abandonment and voluntary resignation. On January 24, 2012, the ABC Board terminated Perry's employment. Knight testified that, after Perry was terminated, Goolsby and Rogers congratulated him.

Plaintiff Valencia Aaron

ABC Enforcement Agent Valencia Aaron, an African-American, submitted her first application for employment to the ABC Board on October 25, 2004. She was first contacted for a physical abilities examination on October 1, 2005. After declining an initial employment offer in Mobile, Alabama, Aaron was appointed to an ABC Enforcement Agent position in Birmingham, Alabama on December 20, 2005. She began work for the Board on January 21, 2006. She was

hired at a salary two steps above the minimum for the position, so as to match her pay at her previous employment.

After Aaron was hired, she attended the ABC Academy in Selma, Alabama. While there, she was required to qualify in using a handgun with which she had no experience. Aaron was told during the Academy that someone did not want her to qualify, and Aaron believed this to mean that Rogers and then-Administrator Folmar were against her. However, after training with a white officer, she qualified with the handgun on her second attempt.

On April 7, 2006, Aaron received a job evaluation recommending that her probationary status be extended. The stated reason for extending her probation was "to adequately observe, document and appraise her performance in a manner fair to both her and the agency." (Doc. # 129-11 at 3.) Specifically, her probation was extended because she lacked the necessary certification for handling a firearm as an enforcement officer. On June 22, 2006, Folmar asked the SPD to extend Aaron's probationary period by three months, and the request was subsequently approved.

Aaron attained permanent agent status on October 20, 2006. She continues to hold this position today. On November 20, 2006, Aaron requested a transfer from Jefferson County to the Drug Unit in Montgomery, Alabama to be closer to her husband and child. On March 17, 2007, Rogers notified Aaron that her transfer request had been approved.

While at the Drug Unit, Aaron conducted undercover drug purchases. In addition, she asked Captain Vance Patton ("Patton"), a white male, and Sergeant James Collins ("Collins"), an African-American male, about serving as a trainer during this period. She was interested in a trainer opportunity because of her experience as a trainer in the military. However, Collins only

responded that there was not an application for the training task force. Instead, Collins said that trainers were simply selected. Patton never responded to Aaron's inquiry.

Aaron notified Patton on June 13, 2008 that she was pregnant. She did not disclose her pregnancy earlier due to concern that she would not be allowed to continue working. After initially being told that she would not be allowed to perform light-duty work for the Board during her pregnancy, Aaron was assigned to light-duty work with renewals. Her supervisor, on orders of Rogers, kept close watch over Aaron's productivity during this time. On October 1, 2008, Aaron was involuntarily transferred in the same building from the Drug Unit to the District Ten Enforcement Office, also in Montgomery County. Aaron was transferred because her Drug Unit salary was paid for by a federal grant that required her to do undercover drug work. Because she was doing renewals and not drug work, her salary was no longer covered by the grant. However, Aaron's transfer became permanent.

On March 2, 2009, Aaron submitted an application for promotion to sergeant. Another agent, Scottie Chandler ("Chandler") was promoted to sergeant off of a Certificate of Eligibles generated by the SPD on February 27, 2009, a few days before Aaron's application. Aaron was not on this Certificate of Eligibles. Darick Wilson ("Wilson") was promoted from agent to sergeant off of a Certificate of Eligibles generated on May 12, 2009. Neither Aaron nor any other African-American agent was on the May 12, 2009 Certificate of Eligibles.

After he made complaints of corruption in the office, Aaron's supervisor, Dennis Hill ("Hill"), was removed from District Ten on October 23, 2009. His replacement, Defendant Turner, white, "had a reputation as being the person who would terminate employees that Chief Rogers wanted gone." (Doc. # 132 at 17; Doc. # 128-1 at 580:5–16.) Soon after arriving in District Ten, Turner told Aaron that she was not there to "get" Aaron. (Doc. # 128-1 at 580:14–

16.) Aaron believed this was a threat to two other African-American agents, Stephen McKitt ("McKitt") and Taylor.

Around the time Turner became supervisor, Agent Richard Holston ("Holston"), white, was transferred to District Ten. Holston requested the transfer to be close to his grandmother, who was ill. However, once he arrived, Holston told Aaron that Rogers and her main District Ten supervisor, Lieutenant Davis, had instructed him to keep watch over Aaron. He also said that he "knew people thought he was a 'mole' and there to 'snitch' on other employees." (Doc. # 132 at 18; Doc. # 128-1 at 301:18–302:22.)

On May 29, 2010, the SPD issued a Certificate of Eligibles for an Enforcement Sergeant position. The ABC Board intended to promote a new Enforcement Training Coordinator ("ETC") through this sergeant position. On the Certificate, both Aaron and Jason Roberts ("Roberts"), a white male, were ranked in Band Two. However, Roberts, and not Aaron, was chosen. The Board says it chose Roberts because of his extensive firearms training experience. By her admission, Aaron lacked Roberts' level of firearms training and experience. To Rogers, firearms training experience was critical for a person who would oversee other firearms training instructors. On June 2, 2010, Aaron was notified that she was not selected for the sergeant position.

On August 9, 2010, while on FMLA leave prior to knee surgery, Aaron traveled with Perry to the EEOC office to fill out an intake questionnaire. Aaron's intake questionnaire indicated that she was denied promotion to Roberts' position on the basis of her race and sex. (Doc. # 101-23 at 1.) That same day, she filed a Charge with the EEOC containing the same allegations. (Doc. # 131-4 at 3.) On August 10, 2010, Aaron filed a grievance with the SPD

alleging race discrimination. The EEOC notified the Board of Aaron's Charge on August 12, 2010.

After filing her Charge, and while still on FMLA leave, Aaron says she noticed several instances of ABC surveillance in her neighborhood. She also says that she saw an ABC agent following her during a shopping trip. She testified in deposition to being afraid that the ABC Board might poison her office water bottle or take some other action to hurt her.

During Aaron's FMLA leave, Davis completed a performance review of Aaron. The appraisal contained lower scores than prior evaluations but still stated that Aaron met standards. Aaron only saw the contents of this review after receiving her personnel file in preparation for her SPD hearing. According to Goolsby, Davis had a deadline for submitting the completed appraisal to the SPD. (Doc. # 101-28 at 17:11–15.)

On September 28, 2010, Roberts sent an email to the entire Enforcement Division soliciting interested candidates to apply for a training instructor position. Aaron did not respond to this request. Prior to Aaron's complaints, no procedure existed whereby interested persons could apply to become training instructors.

After returning from FMLA leave and her knee surgery, Aaron was assigned twice to work football games at a store in Auburn, Alabama. Aaron argued against the assignment for several reasons. First, it put unnecessary strain on her knee. Second, she had done two game assignments prior to taking leave to ensure that she would not have to do that work after her surgery. Finally, she identified at least one white agent who had not done any game assignments by that time. Regardless, Collins told Aaron that Davis was requiring Aaron to do the assignments to make up for missed work during her leave.

Aaron also noticed at this time that Davis was returning her and another African-American agent, Stephen McKitt's, paperwork with multiple red marks. Some of the criticisms noted by Davis were instances where Davis was incorrect. Collins at one point researched and printed multiple examples of instances where Davis had made mistakes in his paperwork. According to Aaron, Davis would never return paperwork to two white agents, Jeremy Peterson ("Peterson") and Craig Shook ("Shook"), despite serious errors. (Doc. # 128-1 at 315:7–21.)

The SPD held a hearing on Aaron's grievance on December 16, 2010. The next day, Davis held a meeting with the District Ten agents and announced a list of policy changes. Among those changes was a requirement that all personnel be finished with breakfast by 8:00 A.M. A few days before, Davis had seen McKitt and Aaron having breakfast together in the break room. Despite several times in the past when Davis had seen Holston, Shook, Peterson, and another white agent, Mark Barber ("Barber"), eating breakfast in the break room and said nothing, Davis told Aaron and McKitt that they would no longer be able to have breakfast together. To Aaron, Davis' new policy was another example of harassment.

On January 7, 2011, Aaron attended the normal District Ten meeting. During the meeting, Davis asked everyone to express their opinions on how the office was being run. In response, Aaron told Davis that she thought his actions were retaliatory. The next day, January 8, 2011, Rogers sent an email to Davis stating that Aaron was being disruptive and that her conduct in the workplace was making other employees uncomfortable. Later that day, Rogers announced his intent to have Aaron "written up" for her actions. (Doc. # 131-5 at 22.) A final counseling form was submitted on January 21, 2011. Aaron submitted a rebuttal on January 26, 2011 that stated she did not consider her actions disruptive.

On January 10, 2011, Davis sent out an email to all District Ten enforcement personnel announcing a new physical training policy. In the past, agents could use time at the beginning or end of his or her shift to work out. Aaron and McKitt were the only two agents who used the morning and afternoon time slots. Under the new policy, agents were barred from using those.

On June 14, 2011, Kesia Perry filed the initial Complaint in this case. On June 20, 2011, the Complaint was amended to add Aaron as a plaintiff. On July 21, 2011, Rogers, through his attorney, sent an email to Aaron concerning interviews for a vacant sergeant position. The email instructed Aaron to respond in writing if she was not interested in the position. On August 1, 2011, Rogers sent Aaron another email reminding her that she needed to respond in writing if she was not interested in an interview. On August 3, 2011, Aaron responded that she was not interested in interviewing for the position. In her email, Aaron wrote that it was her "belief that due to the present and past treatment, interviewing and accepting this position would only enable exploitation [of her] probationary status." (Doc. # 131-5 at 46.) Rogers responded later that day and said that Aaron's fears of being exploited were unfounded.

During this same timeframe, two sergeants of unspecified races were promoted to lieutenants. The two sergeants were first named acting supervisors of their respective districts on July 14, 2011. Then, on August 31, 2011, the two sergeants were announced as having been promoted permanently to lieutenant.

On November 10, 2011, Aaron, Holston, and another white agent, Gary Humphrey ("Humphrey"), answered a call and made five arrests related to a series of thefts in District Ten. Although Aaron made the arrests, Humphrey and Holston were given equal credit. Aaron received a letter of praise for her undercover work. Humphrey and Holston were promoted shortly thereafter.

On December 1, 2011, the Board announced that Collins was promoted to lieutenant and three white agents had been promoted to sergeant positions. On December 5, 2011, Lieutenant William Carson ("Carson") announced to all of the District Ten agents that they would have the opportunity to perform sergeant-level duties. As explained in a December 6, 2011 email, the opportunity was intended to expose interested persons to the sergeant position; participation would not lead to an enhanced chance of promotion. On January 17, 2012, Captain John Richardson ("Richardson"), an African-American, sent an email to the Enforcement Division soliciting applications to provide security for the Speaker of the Alabama House of Representatives. Aaron did not apply for this position because it was a part-time position assisting an ABC sergeant.

On January 31, 2012, Aaron requested FMLA leave for lower back pain. Her request was granted. On March 1, 2012, Carson asked if Aaron could return to work to help with applications. On March 19, 2012, Aaron gave Carson a return-to-work form that prohibited her from heavy lifting. On March 20, 2012, Goolsby wrote to Carson and explained that light-duty assignments were not available unless the injury occurred on the job. That day, Aaron requested that the ABC Board complete a job injury report so that SPD Risk Management could evaluate whether Aaron's injury occurred on the job. On April 6, 2012, Risk Management determined that the injury was not work-related.

On April 10, 2012, Goolsby sent Aaron a letter stating that her FMLA leave would be exhausted on April 23, 2012. The letter was a form letter sent to all employees whose FMLA leave was nearly exhausted, and it said that Aaron could either request an extension of her leave or she could resign. On April 15, 2012, Aaron sent Goolsby an email claiming that his and the Board's refusal to allow her to work light-duty assignments was retaliation.

On July 16, 2012, Carson announced that Holston had been promoted to sergeant in District Ten. Following the announcement, Carson sent an email to Richardson on July 17, 2012 that said there had been opposition to Holston's promotion. Richardson met with District Ten personnel on August 13, 2012 and explained the promotion process. In a memo he wrote on August 13, 2012 to describe the meeting, he noted that everyone in "the group said their previous concerns [had] been discussed and worked out with [Sergeant] Holston and [that] they [would] support him as their immediate supervisor." (Doc. # 131-8 at 20.)

Aaron states that throughout 2011, Holston harassed her. As evidence of this, Aaron points to "the 'grievance' letter he sent to Lieutenant Davis on August 23, 2011." (Doc. # 132 at 44.) In that letter, Holston complains that he believes Aaron and McKitt are given less work than white agents and that McKitt, especially, "is allowed to do anything and everything he wants with no recourse." (Doc. # 131-8 at 42.) In addition, Holston notes that he had "expressed [his] concern and disapproval to [Sergeant] Collins on several occasions when other agents were present," but that Collins had done nothing in response. (*Id.*) There is no indication that Holston was investigated or disciplined for having complained to Collins in the presence of other agents.

Finally, on October 29, 2012, in response to an email from Rogers reminding everyone that they could not take adverse actions against McKitt or Aaron, Holston wrote a memorandum to his file that discussed two interactions between himself and Aaron. First, Aaron was scheduled to work at a store in Auburn on October 17, 2012. That morning, Collins contacted Holston because Aaron had not arrived at her assigned store. Holston then contacted Aaron and told her that Collins was looking for her. Second, Holston contacted Aaron about a payment request on October 29, 2012. Holston believed the payment request should have been higher than what Aaron had reported. According to Holston, "Agent Aaron was noticeably aggravated at being

19

questioned." (Doc. # 131-8 at 24.) As part of that conversation, Holston "checked the agents manual and discovered that there is no standard, but that agents need to have their payment amounts approved." (*Id.*) During this discussion, Holston felt threatened by Aaron.

Plaintiff Stacy Taylor

ABC Enforcement Agent Stacy Taylor, an African-American, was hired by the ABC Board on January 19, 2007, with an effective date of March 1, 2007. He was working as a Montgomery County Deputy Sheriff at the time he was hired. His first appointment was to the ABC Board's District Three office located in Birmingham, Alabama. While in Birmingham, Taylor believed he experienced a racist atmosphere. He was the only African-American in that office at the time. The other agents would split into separate work details and would exclude him, and they would not include him in any after-work social activities. Ultimately, Taylor discussed his exclusion with the other agents, and they began to include him.

In September of 2007, Taylor requested a transfer to District Thirteen, the drug unit of the ABC Board based in Montgomery. The request was addressed to Rogers, Assistant Director of ABC Enforcement at that time. A few days later, Rogers denied Taylor's request because the Board was not accepting transfers to the drug unit. In his denial, Rogers encouraged Taylor to reapply when the Board sent notice that it was accepting transfer requests. However, the Board never sent notice for transfers until after Taylor had left the ABC Board.

A few weeks after his initial request for a transfer, in late September, Taylor sent a new request, but this time for District Ten in Montgomery. Taylor cited an ongoing divorce and the need to be close to his children as reasons for the request. Taylor subsequently followed up with

another request for a transfer to District Ten on October 5, 2007. Finally, Taylor again requested a transfer to the drug unit on December 17, 2007. Rogers never responded to any of these additional requests.

In early January, 2008, Chief Roy Houlton transferred Taylor from Birmingham to District Ten in Montgomery. In June, the Board placed a GPS device on another African-American agent's state-issued car. That agent, Stephen McKitt, told Taylor that Taylor's state-issued car was being tracked with a GPS device as well. Another African-American employee at the Central Office, Anthony Thornton, also told Taylor that his car was tracked with a GPS device. The Board admits that it put a GPS device on McKitt's car but denies having put a device on Taylor's car.

On July 10, 2008, Taylor sent yet another request to Rogers for a transfer to the drug unit. The next day, Taylor's supervisor, Lieutenant Dennis Hill, forwarded Taylor's request to Rogers along with a note in support of the transfer. Taylor was never transferred to the drug unit.

While in District Ten, Taylor's assigned area focused mostly on Bullock County. According to Taylor, the county has few licensees or applicants due to local poverty and sparse population. In addition, Taylor says that problems in his area further decreased because his thoroughness in inspections led to widespread compliance. Finally, Taylor at one point maintained a field office in a strip mall in the county. The office was old and musty, and it did not have a telephone. Ultimately, a business owner called and said the office was no longer available to the ABC Board. Despite this, Taylor says that he performed all of the duties expected of him in Bullock County while also helping other agents with their investigations and inspections.

During his time at District Ten, Taylor was assigned to drive an Alabama state senator and an ABC Board captain. Both the senator and the captain are African-American. Taylor complained of the senator assignment to Hill, but Hill responded that the African-American senator wanted an African-American agent to drive him.

In December 2008, Taylor was assigned to work in the ABC Board warehouse for one week. Warehouse assignments are undesirable; they are hot and dirty. Hill assigned Taylor to the warehouse as discipline for Taylor's low statistics. Taylor argued that his statistics were fine; he was ranked in the middle of all agents statewide. However, the Board argues it made its decision based on the number of cases Taylor made prior to that point. Based on this statistic, Taylor was at the bottom of the statewide agent rankings.

Taylor complained to Hill that the assignment was based on race. Hill communicated this concern to the Central Office, but Taylor was assigned to the warehouse anyway. While working in the warehouse, a white agent refused to allow Taylor access to the office or to a golf cart used for riding around the warehouse. Taylor saw white agents using the golf cart on numerous occasions, but he never saw African-American agents using the golf cart.

On February 5, 2009, Goolsby requested that white agents Chandler and Wilson's positions be reallocated from agent to sergeant. The SPD approved these reallocations on February 27, 2009 and a Certificate of Eligibles was created. Chandler was on this certificate, but Wilson did not meet the minimum requirements because he had not worked with the Board long enough. On March 2, 2009, Taylor submitted an application for promotion to sergeant. On May 11, 2009, Chandler was notified of his promotion to sergeant. On May 12, 2009, a new Certificate of Eligibles was generated that listed Wilson. That same day, Wilson was notified of

his promotion to sergeant. No African-Americans, including Taylor, were on either Certificate of Eligibles.

On June 3, 2009, Taylor was involved in an incident concerning his ex-wife, a Montgomery Police Officer, and his girlfriend. His girlfriend, a Montgomery County Sheriff's Deputy, went to his ex-wife's home and demanded to know whether the ex-wife had been seeing Taylor. After leaving, the girlfriend returned to Taylor's home, brandished her weapon, and demanded Taylor come outside. Taylor verbally reported this incident to Hill, his immediate supervisor, and to his girlfriend's supervisor at the Sheriff's Department. Despite this report, Internal Affairs, through Captain Vance Patton, began an investigation. Patton did not contact Hill but instead received notice of the incident through Captain Richardson. Richardson had discovered the incident from the Montgomery County Sheriff's Department. After a subsequent interview, Patton noted that "Taylor could not provide a reason he did not notify his supervisors, although Agent Taylor did notify [his girlfriend's] supervisor." (Doc. # 137-35 at 2.)

At first, the Administrator wanted a five-day suspension as discipline. Patton disagreed with the Administrator and suggested a three-day suspension. According to Patton, Rogers spoke with the Administrator on Taylor's behalf and convinced the Administrator to give Taylor a two-day suspension. In memoranda from both Patton and Rogers, the ultimate disciplinary action recommended was a two-day suspension. Taylor states that he informed Rogers of his report to Hill; he does not mention whether he informed Patton. Finally, Taylor implies that he accepted the suspension based on another African-American sergeant's recommendation. (Doc. # 137-13 ¶ 27.) The other sergeant warned Taylor that, "if [Taylor] fought the suspension, [Rogers and Patton] might get mad and fire [Taylor]." (*Id.*) Ultimately, on June 10, 2009 Taylor received notice of a two-day suspension, and he declined a hearing into the matter. (Doc. # 137-38 at 2.)

On October 23, 2009, Defendant Turner replaced Hill as the District Ten supervisor. Turner had a reputation for terminating employees that Rogers or the Administrator wanted removed. Shortly after arriving, Turner and Lieutenant Davis discussed the number of cases on which Taylor had been working.

On November 9, 2009, a white sergeant noted a small dent on Taylor's state-issued car's door. Taylor had not noticed the dent prior to that moment. Subsequently, Taylor wrote a brief memorandum stating that he had not noticed the dent nor had he any idea as to how the dent occurred. On November 18, 2009, Taylor received a written warning for failing to maintain his state equipment.

On December 8, 2009, Turner asked Taylor to meet with her and two others about Taylor's case files. In the meeting, Turner told Taylor that he was not performing his job correctly and that he would be transferred to Dothan. In Dothan, there were fewer licensees, and he would be supervised more closely to ensure he did his job properly. Turner reviewed Taylor's statistics with him. The statistics showed that Taylor had made few cases during Hill's tenure as supervisor. Despite this, Turner did not contact Hill to inquire about Taylor's work performance. Furthermore, Turner rejected Taylor's protests concerning the financial hardships attendant to moving to Dothan. After the meeting, Rogers agreed to Taylor's transfer. Rogers then sent a letter to Taylor on December 11, 2009 confirming the transfer to Dothan with an effective date of February 1, 2010.

The day after meeting with Turner, Taylor completed an EEOC intake questionnaire. The EEOC received the questionnaire on December 15, 2009. Two days later, the EEOC sent Goolsby a notice that Taylor had filed a grievance related to alleged race discrimination. No details of the grievance were disclosed, and Goolsby stated that he did not disclose the notice to

anyone other than the Administrator and a few people on his legal staff. There is no cited evidence that Rogers or Turner knew of this notice from the EEOC.

Taylor submitted a letter of resignation on January 25, 2010. In that letter, Taylor stated that he was resigning from the ABC Board because of financial hardship related to his pending transfer to Dothan. Thereafter, the District Ten agents met and convinced Taylor to rescind his letter of resignation. The agents then met with the supervising lieutenant, Davis, and asked him to intervene on Taylor's behalf. Davis sent an email to Rogers stating that the agents wished Rogers to reconsider Taylor's transfer. Rogers responded that Taylor's decision to resign was personal and that Taylor had not discussed any financial hardships with him. Taylor made one telephone call to Rogers which Rogers did not answer. Taylor did not send any emails, did not call multiple times, and did not attempt to communicate in any other way with Rogers. Taylor finished that work week and his employment ended.

As early as February 3, 2010, Goolsby requested that Davis prepare a memorandum recounting the events surrounding Taylor's resignation. Davis complied and sent Goolsby an email containing his statement. Of particular note, Davis stated that he encouraged Taylor to speak with Rogers directly about the transfer. Taylor specifically disputes that Davis ever suggested he speak with Rogers at any time. (Doc. # 137-13 ¶48.)

After his employment with the ABC Board ended, Taylor filed his first Charge with the EEOC on February 18, 2010. In this Charge, he alleged race discrimination, with the most recent discrimination occurring on December 8, 2009. (Doc. # 137-62.) He filed an Amended Charge on October 5, 2010. In this Amended Charge, he alleged continuing race discrimination and, for the first time, retaliation. (Doc. # 137-71.)

# IV.   DISCUSSION

Title VII prohibits an employer from discriminating "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex or national origin." 42 U.S.C. § 2000e-2(a)(1). The Supreme Court in *McDonnell Douglas Corp. v. Green* provided the traditional framework for evaluating cases where, as here, a plaintiff only offers circumstantial evidence in support of his or her retaliation and discrimination claims. Under this framework, the plaintiff must establish a prima facie case of discrimination. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). After the plaintiff has established a prima facie case of discrimination, the burden of production is placed upon the employer to articulate a legitimate, nondiscriminatory reason for its employment action. *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981). Once the employer has met this "exceedingly light" burden, the "plaintiff must demonstrate by a preponderance of the evidence that the employer had a discriminatory intent." *Meeks v. Computer Assocs. Int'l*, 15 F.3d 1013, 1019 (11th Cir. 1994). The plaintiff may seek to demonstrate that the proffered reason was not the true reason for the employment decision "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Id.* at 256; *Combs v. Plantation Patterns*, 106 F.3d 1519, 1528 (11th Cir. 1997). A plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated. *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 147 (2000). That is, even if a plaintiff establishes a prima facie case and offers sufficient evidence of pretext

as to each of the proffered reasons, summary judgment "will sometimes be available to an employer in such a case." *Chapman v. AI Transp.*, 229 F.3d 1012, 1025 n.11 (11th Cir. 2000).

### A. <u>Kesia Perry's Claims</u>

Plaintiff Kesia Perry (Perry) sets out two separate general claims for relief in her Second Amended Complaint. Although Perry's counts are vague, this court has gleaned the following causes of action from Perry's Second Amended Complaint.

### 1. <u>Count I</u>

In Perry's first count of her Second Amended Complaint, entitled "Plaintiff Kesia Perry's Claims of Race Discrimination against the ABC Board (State of Alabama) in Violation of Title VII", she alleges that she "has been discriminated against on the basis of her race in violation of Title VII in promotions, pay, job and work assignments, discipline, evaluations, transfers and in all other terms and conditions including a hostile environment because of racial harassment by her employer, the ABC Board." (Doc. 6 ¶ 184.) For the following reasons, the ABC Board's Motion for Summary Judgment on Perry's first count is due to be **GRANTED**.

#### a. **Perry's Promotion Claim**

*1. Perry's promotion claim is time-barred.*

For a court to consider a Title VII claim, "a plaintiff must first file an administrative charge with the EEOC within 180 days after the alleged unlawful employment practice occurred." *Pijnenburg v. W. Ga. Health Sys., Inc.*, 255 F.3d 1304, 1305 (11th Cir. 2001) (citing 42 U.S.C. § 2000e-5(e)(1)). A filing with the EEOC is "a requirement that, like a statute of limitations, is subject to waiver and estoppel." *Zipas v. Trans World Airlines, Inc.*, 455 U.S. 385, 393 (1982). One area where "strict compliance with Title VII['s filing requirement] is unnecessary is where the plaintiff has filed a charge with the EEOC, but in her judicial action the plaintiff raises related issues as to which no filing has been made." *Wu v. Thomas*, 863 F.3d 1543, 1547 (11th Cir. 1989). "Judicial claims which serve to amplify, clarify, or more clearly focus earlier EEO complaints are appropriate," while "[a]llegations of new acts of discrimination, offered as the essential basis for the requested judicial review[,] are not appropriate." *Id.* (internal quotation omitted). As such, "[t]he proper inquiry […] is whether [the plaintiff's] complaint was like or related to, or grew out of, the allegations contained in [his or] her EEOC charge." *Gregory v. Ga. Dep't of Human Res.*, 355 F.3d 1277, 1280 (11th Cir. 2004). The purpose of the exhaustion requirement is to allow the EEOC priority in effecting voluntary compliance and conciliation between the parties. *Id.* at 1279.

Perry's promotion claim is time-barred. The alleged failure to promote her from ASA II to ASA III occurred in May 2008, but the first EEOC charge was not filed until August of 2010. A charge must be filed within 180 days of the alleged unlawful employment practice. 42 U.S.C. § 2000e-5(e)(1). Because Perry has not pointed to any reason why the filing requirement should be tolled or otherwise waived for her failure to promote claim, and because the claim was not filed until two years later, this claim is barred.

Even if this claim were not time-barred, however, there are other reasons that the claims fails.

### 2.  Perry has not shown that she was qualified for a job for which the employer was seeking applicants.

Even if Perry's promotion claim were not time-barred, she has failed to show an intentional failure to promote. To state a prima facie case of intentional discrimination in a failure to promote case, the plaintiff must demonstrate "1) that she belongs to a protected class; 2) that she was qualified for a job for which the employer was seeking applicants; 3) that, despite her qualifications, she was rejected; and 4) that, after her rejection, the employer continued to seek applicants or filled the position with a person outside of the plaintiff's protected group." *Gaddis v. Russell Corp.*, 242 F. Supp. 2d 1123, 1135 (M.D. Ala. 2003). At issue here are the second and fourth elements of the prima facie case.

Perry was not qualified for a job for which the ABC Board was seeking applicants. It is undisputed that an ABC Board employee is promoted in one of three ways. First, through taking a test, an employee may place in the top ten of persons eligible for a position, including ties for any of the top ten spots. These persons are included in a list turned over to the hiring supervisor in order to help with the decision and are automatically eligible for promotion. Second, any employee in the top fifty percent of test-takers can be promoted after three months in a position, following a reallocation evaluation by the SPD. If the SPD determines that an upgrade of an employee's current position is unwarranted, then there would not be any chance for an employee under this rule to be promoted. Finally, and regardless of where the employee is on the test-taker

list, an employee who has served five years or more at a particular position is eligible for promotion following a reallocation evaluation.

In this case, Perry took the relevant test but failed to place in the top ten. Instead, Perry placed in the top fifty percent and was told that she should retake the examination to improve her chances. Despite this advice, Perry never retook the examination. Thus, in order to be qualified for a promotion, Perry had to either pursue a reallocation or remain in her position for at least five years and request a reallocation at that time. It is undisputed (a) that Perry's supervisors requested a reallocation, but that the SPD (not the ABC Board, as Perry argues in her reply brief) determined that an upgrade was unwarranted, and (b) that Perry had not worked in her position for at least five years. Thus, based on the available promotion process, Perry was not qualified for the ASA III job because she was not eligible for a promotion. Thus, Perry cannot meet the requirements for a prima facie case for failure to promote.

### 3.  Perry has not shown that, after her rejection, the ABC Board either continued seeking applicants or filled any position with someone outside of Perry's protected class.

The ABC Board next argues that Perry has not shown that the ASA III position Perry was seeking was either filled with someone outside of Perry's protected class or that the ABC Board continued seeking applicants for the ASA III position after rejecting Perry. In Perry's brief, she does not mention any other person who received an ASA III position. Instead, it is undisputed that the only person mentioned, Childers, remains an ASA II with the Board. Perry's conclusion that Childers has been kept in an ASA II position as a strategic move in response to this case is irrelevant to her racial discrimination claim: Perry has not shown that someone outside of the

protected class has been promoted. Furthermore, there is no indication that there was a specific ASA III opening available in the Central Office. Rather, the potential for a promotion appears to have been a general possibility available to Perry. Thus, there is no indication that the Board continued to seek applicants for an ASA III position for which Perry had been rejected. Thus, Perry fails to establish the fourth element of the prima facie case.

### 4. Perry has not shown the ABC Board's legitimate, nondiscriminatory reason for failing to promote her to be pretextual.

The Board offers the legitimate, nondiscriminatory reason that Perry was not promoted because she did not fit into any of the categories for promotion. This business protocol is a legitimate, nondiscriminatory reason that is generally applicable to all ABC employees.

A plaintiff may demonstrate that a defendant's reasons for not promoting were pretextual by revealing "such weaknesses, implausibilities, inconsistencies, incoherencies or contradictions in the defendant's proffered legitimate reasons for its actions that a reasonable factfinder could find them unworthy of credence." *Cooper v. Southern Co.*, 390 F.3d 695, 725 (11th Cir. 2004), *cert. denied*, 546 U.S. 960 (2005) (quoting *Combs*, 106 F.3d at 1538). However, a reason is not pretext for discrimination "unless it is shown *both* that the reason was false, *and* that discrimination was the real reason." *Brooks v. Cnty. Comm'n of Jefferson Cnty.*, 446 F.3d 1160, 1163 (11th Cir. 2006) (quoting *St. Mary's Honor Ctr.*, 509 U.S. at 515, 113 S. Ct. 2742) (emphasis in original).

In response to the Board's articulated reason, Perry argues that "the ABC Board made every little move necessary to get [two other employees, Chandler and Wilson] promoted from agent to sergeant and on to lieutenant in a little more than one year." (Doc. 120 at 34.) Moreover,

Perry argues that "[t]he fact that Rogers and Goolsby continued to mislead Perry and give her false encouragement suggests intentional discrimination and is also evidence of pretext." (Doc. 120 at 33.) However, Perry has failed to argue how these actions by the Board, even if true, amounted to a bypassing of the typical promotion scheme for employees. In other words, Perry has not shown that these actions allowed Chandler and Wilson to be promoted despite not meeting one of the three promotional criteria. Furthermore, Perry has not argued different treatment for herself in this regard. While Perry does say that the Chief personally delivered Chandler and Wilson's applications to the SPD, Perry does not provide evidence that this was what got the other employees their jobs or that the Chief did not help Perry in other ways to get her a promotion. Rather, Perry even admits that she had been encouraged by the Chief to take the ASA III test. (Pl. Ex. A at 92:15–17.) Finally, she presents no evidence showing that Rogers and Goolsby continued to mislead Perry. Specifically, she does not present any evidence that, had she taken the test and scored in the top ten plus ties, she still would not have been eligible for promotion to an available ASA III position.

While seemingly confusing a claim for disparate pay with a claim for failure to promote, Perry discusses whether the Board's reason for failing to promote Perry was pretext in her discussion of disparate pay. In that section, Perry argues that she can demonstrate pretext because "(1) the ABC Board was able to assign job duties which would have resulted in a promotion, (2) Perry requested additional duties during her first few years as an employee, (3) the ABC Board declined to assign Perry those job duties until Sullivan announced her plan to retire, (4) the ABC Board hired Childers and gave Sullivan's job duties to Childers, and (5) Rogers, Goolsby and Hatfield either misrepresented or, in Hatfield's case misunderstood, what Perry needed to do to get a promotion." (Doc. 120 at 36.) While it is undisputed that the Board

could have assigned additional duties so that a desk audit of Perry's position would have been more favorable for a promotion, Perry has failed to show what job duties, besides Sullivan's, she requested or whether the Board actively rejected her requests. Furthermore, the evidence indicates that Sullivan's jobs were not reassigned to Childers; rather, the duties associated with that position were either automated or distributed throughout the districts. (Pl. Ex. D at 168:4–12.)   Finally, there is no indication that Rogers, Goolsby, or Hatfield misrepresented or misunderstood the requirements to get a promotion. For Perry to be eligible for an automatic promotion, she needed to score better on the test. If she were to receive a promotion through a reallocation, then her supervisors were frank in telling her that a reassignment to District Ten would allow her new opportunities to advance. Thus, these arguments for pretext fail.

Perry also argues pretext on the basis of a prior incident where an agent had voluntarily removed his name from the top ten register in order to allow another agent to be promoted from below. Immediately after voluntarily removing his name from the list and allowing the lower person to be promoted, the higher person requested that his name be returned to the list. Without this method, the lower person would not have been reachable for a promotion. Goolsby testified that this action was a personal decision and that it had happened in the past.[1] Perry argues that this shows race discrimination because both of the agents were white. In addition, Perry infers that the lieutenant took his name off the list as a favor to then-ABC Administrator Folmar and Rogers at the time. However, even accepting this as true, Perry does not connect this scheme to race discrimination: she has not produced any evidence indicating that the lieutenant's actions allowed a white agent to be promoted over an African-American agent. There could be any

---

[1] Goolsby testified that he had in fact received his promotion through this method. (P. Ex. I at 294:9–11.)

number of reasons why Folmar and Rogers wanted the one to be promoted, and Perry has not shown any evidence of race discrimination. Thus, this argument for pretext fails as well.

Finally, Perry highlights the short period of time in which the two white sergeants were promoted to lieutenant. In her argument, Perry points out that, at least with one of the two persons, the Administrator wanted Goolsby to deliver a reallocation request to the SPD immediately. Furthermore, Perry points to Goolsby's testimony that the two persons were at the bottom of the top ten plus ties while an African-American man was at the top of the list. Finally, Perry argues that "[t]he application [for Perry that Goolsby] submitted […] necessitated a desk audit while the submissions for [the other two employees] did not." (Doc. 120 at 39.) Once again, however, Perry does not connect any of this with racial animus on the part of the Board, nor does she show how promotion decisions with sergeants relate to promotion decisions with administrative assistants. All Perry shows is that, in following its normal Top Ten Plus Ties protocol for promotions, the Board chose the last spot on the list for promotion instead of the top spot. Perry has not provided evidence that all of the other candidates were African-American, meaning that whites could also have been disadvantaged, nor has she shown that the only reason the top candidate was not chosen was his race. Finally, Perry has not shown how Goolsby's lack of enthusiasm affected her failure to receive a promotion. The SPD came to Perry's office and did a personal desk audit of Perry's position. The SPD subsequently made its own, separate determination that Perry's job did not warrant reallocation to an ASA III position. There is no indication of any involvement with this process by the ABC. Thus, Perry has failed to offer such inconsistencies as to rebut the Board's legitimate, nondiscriminatory reason for failing to promote Perry. Neither has Perry shown any evidence of a valid comparator to her being treated differently for racial reasons in regard to promotion eligibility.

Because Perry has failed to rebut the Board's legitimate, nondiscriminatory reason, Perry's claim for failure to promote fails.

### b.  Perry's Disparate Pay Claim

"To state a prima facie case of intentional discrimination in compensation, a plaintiff must establish that (1) she belongs to a racial minority; (2) she received low wages; (3) similarly situated comparators outside the protected class received higher compensation; and (4) she was qualified to receive the higher wage." *Cooper v. Southern Co.*, 390 F.3d 695, 734–35 (11th Cir. 2004).

For the purposes of its Motion for Summary Judgment alone, the ABC Board concedes that Perry has established a prima facie case for intentional discrimination in compensation. However, the Board argues that its policy of matching employees' salaries when they switch to a job with the ABC Board is a legitimate, nondiscriminatory reason for providing different compensation. The court agrees. Because the ABC Board has met its light burden in arguing a legitimate, nondiscriminatory reason for paying Childers more than Perry, the burden shifts to Perry to establish an issue of fact as to whether the Board's excuse was merely pretextual.

Perry has not succeeded in showing that the Board's salary matching is pretext for discrimination. Although Perry has shown that the salary matching policy had not been used with some other ASA applicants before Childers, she has not provided evidence of similarly situated whites who were unemployed at their time of hire but who received a higher than minimum starting salary. Moreover, the Board's summary of salary matches shows that the first salary match undertaken by the Board for an applicant from outside the state system was to one of the

plaintiffs in this case, Taylor, an African-American male, one year prior to the next salary match. This general application of the salary matching policy, without any evidence of similarly situated whites receiving more favorable treatment, discredits Perry's allegations of discrimination. Furthermore, the ABC Board argues that it applied its salary matching policy to Childers and not to Perry, thus accounting for the disparity in pay, because Perry was unemployed when she received her position while Childers was employed. Because Perry admits that she was unemployed at the time she interviewed for and received her job, Perry cannot show that the Board's decision not to apply salary matching in her case was false. She had no existing salary to match. Finally, Perry makes a great deal of the fact that Childers is Rogers' sister-in-law. Even if further evidence could show that the reason provided by the Board was somehow false, that alone would not prove that the real reason was racial animus. Instead, additional evidence would be required to show race discrimination instead of nepotism or simple personal preference. *Reeves*, 530 U.S. at 147. Thus, Perry has not shown that the salary matching reason is pretextual, and her claim must fail. Therefore, the Board's Motion for Summary Judgment on the disparate pay claim is **GRANTED**.

### c. Perry's Claims on Evaluations, Assignments, Discipline, and Transfers

Perry has alleged that she received different evaluations, assignments, discipline, and transfers on account of her race. To establish a prima facie case, Perry must show that 1) she belongs to a protected class; 2) she was subjected to an adverse employment action; 3) her employer treated similarly situated employees outside her classification more favorably; and 4) she was qualified to do the job. *McDonnell Douglas Corp.*, 411 U.S. at 802. The Board does not

contest Perry's assertion that she is in a protected class nor that she was qualified to do the particular job.

   1.  *Perry's new job and work assignments do not constitute adverse employment actions for purposes of the prima facie case.*

"[T]o prove adverse employment action in a case under Title VII's anti-discrimination clause, an employee must show a *serious and material* change in the terms, conditions, or privileges of employment." *Davis v. Town of Lake Park, Fla.*, 245 F.3d 1232, 1239 (11th Cir. 2001) (emphasis in original). The employee's subjective view does not control; rather, "the employment action must be materially adverse as viewed by a reasonable person in the circumstances." *Id.*

Perry does not seem to allege that she has been saddled with unwanted job or work assignments. Rather, the converse appears to be true: that Perry, in an effort to get promoted, requested new duties; that, while at first her request to receive some of Sullivan's duties was honored, over time those duties were taken from her; and that those duties that were taken from her were reassigned to Childers. In sum, it would appear that the material adverse employment action arguably arises from the Board's attempting to neutralize Perry by minimizing her assignments, not from an attempt to burden Perry with unwanted tasks.

Perry has not demonstrated the serious and material change in the terms, conditions, and privileges of her employment resulting from her new assignments that is necessary for a Title VII claim. *Davis*, 245 F.3d at 1239. All Perry has done is allege that the assignments were based on discrimination; she has not identified any evidence of how her job was seriously and materially changed. Moreover, she has failed to refute evidence she herself provided that

37

Sullivan's duties were either automated or distributed to district lieutenants. (Doc. # 120 at 13; Doc. # 121-4 at 168:2–169:1; *see also* Doc. # 121-4 at 103:13–104:10, 146:15–19.) Because the only evidence identified by either party suggests that Perry would not have received or kept those duties regardless of Childers' employment, Perry has not shown a material adverse employment action. Thus, Perry's prima facie case for assignment discrimination fails.

### 2.  *Perry's transfer to District Ten does not constitute an adverse employment action.*

As discussed, adverse employment actions are examined according to how a reasonable person would view the action, not how the employee subjectively perceives the action. *Id.* Without this requirement, "'every minor or even trivial employment action' would constitute grounds for a discrimination suit." *Smith v. Ala. Dep't of Pub. Safety*, 64 F. Supp. 2d 1215, 1221 (M.D. Ala. 1999) (quoting *Smart v. Ball State Univ.*, 89 F.3d 437, 441 (7th Cir. 1996)). "Furthermore, a lateral transfer that results in no loss in pay, benefits, or classification does not generally constitute an adverse employment action." *Id.* (determining that a transfer from Montgomery to Selma was not an adverse employment action). "[I]f the court were to hold that lateral transfers were tantamount to adverse employment actions anytime an employee was displeased with his or her transfer, '[t]he Equal Employment Opportunity Commission, already staggering under an avalanche of filings too heavy for it to cope with, would be crushed, and serious complaints would be lost among the trivial.'" *Id.* at 1222 (quoting *Williams v. Bristol–Meyers Squibb Co.*, 85 F.3d 270, 274 (7th Cir. 1996)) (internal quotations omitted).

Perry has not shown that the Board's decision to transfer her to District Ten constituted a material adverse employment decision. Rather, it is undisputed that the transfer placed Perry into

a position that consisted of similar job duties as her prior position at the Central Office. It is also undisputed that Perry's new position in District Ten placed Perry closer to her home and her children's school, thus shortening her commute time. Further, Perry's supervisors testified that the transfer would place Perry in a better position for a promotion. Specifically, the District Ten position was one in which the ABC Board and SPD had found potential for an ASA III position.[2] Because the transfer was lateral and did not result in a "loss in pay, benefits, or classification," the transfer was not an adverse employment action. Moreover, because Perry has only stated that she personally preferred to be at the Central Office, but that she made the best of her new position in her continuing search for a promotion, Perry has not shown that the transfer was an adverse employment action from an objective standpoint. Thus, Perry's prima facie case for disparate treatment with the transfer must fail.

### 3. The Board's written reprimand does not constitute an adverse employment action.

As discussed, an employment decision must result in a serious and material change in the conditions, terms, or privileges associated with employment. *Davis*, 245 F.3d at 1239. The results must be serious and material in the eyes of a reasonable person; the plaintiff's subjective view is not controlling. *Id*

In this case, the reprimand did not result in any change to Perry's terms, conditions, or privileges of employment. Rather, the reprimand was only the first step in the disciplinary

---

[2] Indeed, Perry's immediate supervisor at the time, Hatfield, appears to imply that the transfer was his idea. In response to the question as to whose idea it was to transfer Perry, Hatfield responded, "It would give her more of an opportunity to have a diverse work place. And most of all your district personnel are three's anyway. It would put her in a place where she could have more of a diverse type of work and an opportunity to become [an ASA] three." (Pl. Ex. D at 169:6–15.)

process. Because Perry did not subsequently experience a change in any benefits, pay, or any other term, condition, or privilege associated with her job, there has not been an adverse employment action. Thus, the prima facie case for racial discrimination in Perry's reprimand fails.

### 4.  Perry has not identified any issues with her evaluations, including any adverse employment actions related to the evaluations.

Apart from her complaint, Perry does not identify any problems with her work evaluations. In addition to her failure to establish any comparators, Perry also does not identify any adverse employment decisions resulting from her evaluations. Rather, the record evidence indicates that Perry had no issues with any of the evaluations. *E.g.*, (Pl. Ex. A at 87:5–8.) Furthermore, there is no indication that the evaluations ever led to any adverse employment decision; to the contrary, her evaluations had been good and supervisors testified to wanting to position her for a promotion during the time she was receiving these high marks. Thus, because Perry has not identified any issues with her evaluations, she has failed to establish a prima facie case for disparate treatment with her evaluations.

### 5.  Perry has not identified any comparators.

"The plaintiff and the employee she identifies as a comparator must be similarly situated 'in all relevant respects.'" *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1091 (11th Cir. 2004). "In determining whether employees are similarly situated for purposes of establishing a prima facie case, it is necessary to consider whether the employees are involved in or accused of the

same or similar conduct and are disciplined in different ways." *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997). But, "[i]f a plaintiff fails to show the existence of a similarly situated employee, summary judgment is appropriate where no other evidence of discrimination is present." *Id.*

Perry has alleged that she was treated differently in evaluations, assignments, disciplinary actions, and transfers based on her race. However, in asserting disparate treatment in these employment conditions, Perry does not point to any white, similarly situated coworkers who have acted in a similar manner but who have received more favorable treatment. In fact, the only other person mentioned as having been in trouble is Flores, a white woman who was disciplined for looking at the salary website. By contrast, Perry was only counseled for the same activity. Because Perry has not identified any comparators who are similarly situated in nearly all respects and who have received more favorable treatment, and because Perry has not shown any other evidence of discrimination related to these claims, her prima facie case must fail.

### 6. Perry has not rebutted the Board's legitimate, nondiscriminatory reason for its disciplinary actions.

Even assuming that Perry had established a prima facie case in her disparate discipline claims, Perry has not pointed to any evidence or arguments against the Board's legitimate, nondiscriminatory reason for the reprimand and suspension. The Board argues that it suspended Perry because she was "a problem employee who refused to comply with leave policies." (Doc. 104 at 39.) Moreover, the record evidence shows that the reprimand was issued following a conversation between Perry and her supervisor after she failed to show up to work at the appropriate time. (Pl. Ex. 50.) During this conversation, Perry told her supervisor that she had to

41

be late because she was helping her father who had recently suffered a heart attack. However, Perry never requested permission to be late. Furthermore, Perry testified in her deposition that her supervisor believed the conversation to have been an altercation, but she dismissed it because the supervisor was sensitive. (P. Ex. A at 248:22–249:4.) The Board's stated reason was that Perry's subsequent reprimand was issued based on Perry's tardiness and her insubordination. Based on these reasons, this court finds that the Board met its "exceedingly light" burden of proffering a legitimate, nondiscriminatory reason for its disciplinary actions. Thus, the burden shifts to Perry to argue reasons why the reasons are pretextual.

Perry has not met her burden because she has not pointed to any argument or evidence supporting a claim that the Board's reasons are pretextual. Perry's brief ignores these questions and instead focuses solely on the prima facie case and the Board's proffered reason. Because the burden shifted to Perry to produce some indication that the reasons were pretext for racial discrimination, and because Perry failed to offer such evidence, the Board's motion for summary judgment on  the disparate treatment claim in disciplining Perry is due to be **GRANTED**. *Celotex*, 477 U.S. at 324 (stating that, once the moving party has met its burden, the nonmoving party "must go beyond the pleadings" and show that there is a genuine issue for trial).

### d.  Perry's Hostile Work Environment Claim

The prima facie case for a hostile work environment claim requires the plaintiff to show "(1) that he belongs to a protected group; (2) that he has been subject to unwelcome harassment; (3) that the harassment must have been based on a protected characteristic of the employee, such as national origin; (4) that the harassment was sufficiently severe or pervasive to alter the terms

and conditions of employment and create a discriminatorily abusive working environment; and (5) that the employer is responsible for such environment under either a theory of vicarious or direct liability." *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1275 (11th Cir. 2002). The Board appears to take some issue with the second element,[3] but it expressly argues that Perry cannot establish the fourth or fifth[4] elements of the prima facie case. The court examines only the fourth element in this case.

Perry claims she was racially harassed on several occasions. First, she claims she was racially harassed when she was counseled on May 3, 2010 for disrupting the office after looking at the pay website. Second, she says she was racially harassed when she was told on May 3, 2010 that she could no longer take breaks with Flores. Third, she claims she was racially harassed when she was transferred to District Ten on June 24, 2010. Fourth, she argues she was racially harassed when she was interrogated on August 6, 2010 about her relationship with Lard. Fifth, she claims to have been racially harassed when she was reassigned to work for Goolsby on November 19, 2010 and when Goolsby subsequently did not allow Perry to take time off unilaterally on April 14, 2011 to care for her father. Finally, she claims she was racially harassed in July of 2011 when Knight was made her supervisor and when she was made to work with a

---

[3] The Board argues that the harassment was not unwelcome because of allegations that Perry engaged in a racially insensitive joke. While there is support for the proposition that engaging in the abusive behavior defeats the second element, *see, e.g.*, *Balletti v. Sun–Sentinel Co.*, 909 F. Supp. 1539 (S.D. Fla. 1995), the court here does not need to decide definitively whether the harassment was unwelcome. Perry's hostile work environment claim fails for another reason.

[4] The Board in its brief, and Perry in her response brief, devotes substantial space to analyzing the Supreme Court's recent decision in *Vance v. Ball State University*. In that case, the Supreme Court clarified the test for determining whether an individual is a supervisor for Title VII purposes. *Vance v. Ball State Univ.*, 133 S. Ct. 2434, 2443 (2013). Determining who qualifies as a supervisor is important for an employer's *Farragher–Ellerth* defense. However, as with the Board's argument on the second element, Perry's hostile work environment claim fails for another reason, and the court thus does not need to determine who the supervisors were in this case.

difficult co-employee. Perry also claims that she was harassed when Rogers requested her internet usage reports on June 25, 2010 and when Rogers requested on November 16, 2010 that Goolsby discipline her for deleting emails, but she does not say that she was aware of these actions. Further, Perry points to Rogers' use of racial slurs in her brief, but she does not identify specific instances of such language in her hostile work environment argument.[5]

The requirement that the harassment be sufficiently severe or pervasive contains both an objective and subjective element. *Id.* "Thus, to be actionable, this behavior must result in both an environment that a reasonable person would find hostile or abusive and an environment that the victim subjectively perceives to be abusive." *Id.* (internal quotations and alterations omitted). In examining objective severity, the court considers "(1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance. *Id.* As the Supreme Court has stated "teasing, offhand comments and isolated incidents do not constitute discriminatory changes in the terms and conditions of employment." *Satchel v. Sch. Bd. Of Hillsborough Cnty.*, 251 F. App'x 626, 630 (11th Cir. 2007) (citing *Faragher v. City of Boca Raton*, 524 U.S. 755, 788 (1998)).

---

[5] For thoroughness, and despite Perry's failure to connect these instances from her facts section to her argument, the court includes here the instances of Rogers' alleged racist language. A former agent testified that she had heard Rogers comment that District Ten was "getting too dark." (Doc. # 121-12 at 38:2–8.) That same agent testified that Rogers had told her not to consider a job applicant too favorably because "she had a reputation of being one of those uppity black bitches." (Doc. # 121-12 at 82:21–83:5.) Rogers admitted using the "n-word" in a conversation with Goolsby about hiring an African-American agent. (Doc. # 121-7 at 88:16–20.) Turner said Rogers used the "n-word" when recounting a story told by Perry at Perry's request. (Doc. # 121-8 at 204:11–205:7.) Hill testified that Rogers once stated that "all those N words wanted something for nothing" in discussing the current lawsuit. (Doc. # 121-5 at 14:17–15:4.) Finally, Hatfield testified that he had heard Rogers use the "n-word" but that he could not remember where or in what context. (Doc. # 121-4 at 126:13–128:1.)

The alleged harassment in this case was not sufficiently severe or pervasive to constitute a racially hostile work environment. As the Board's brief points out, numerous employees of the ABC Board testified that they had never personally heard the main supervisors or administrators use racially abusive language in the workplace. (Doc. 104 at 41–44.) Those employees that did testify to abusive language either mentioned only a few instances of the language or rumors that a supervisor had used that language in the past. *See, e.g.*, (Pl. Ex. A at 124:14–132:15.) Even though one supervisor, Rogers, testified specifically to having used racially abusive language at work on at least one occasion, this was not directed at Perry, nor was the comment made in her presence.  He testified, and there has been no evidence to contradict him, that the language was not habitual or customary. (Def. Ex. 75, 84:23–85:19.) There have clearly been little more than sporadic, isolated utterances that, individually, are offensive, but in sum cannot be aggregated to be "severe or pervasive" enough to constitute a hostile work environment. All Perry has argued is that a number of supervisors and administrators have used, or have potentially used, racially abusive language, but only in one or two instances. Thus, because these sporadic instances of racially insensitive language do not constitute "severe or pervasive" conduct that would alter the terms and conditions of employment, Perry cannot establish a prima facie case for hostile work environment.

Furthermore, each of Perry's alleged instances of racial harassment fail to show a racially hostile work environment. Specifically, Perry has failed to show how her perception of a racially hostile work environment was objectively reasonable or how they were racially motivated. She has not shown that the actions were unduly severe. She has not shown whether the conduct was physically threatening or humiliating. Finally, Perry has not connected any of the alleged actions to racial animus. Thus, Perry has failed to show the severe or pervasive racial harassment needed

for a hostile work environment claim, and as such the Board's motion for summary judgment on that claim is due to be **GRANTED**.

## 2.  Count II

In Perry's second count of her Second Amended Complaint, entitled "Plaintiff Kesia Perry's Claims of Retaliation for Opposing Discrimination Filing an Internal Complaint with the State Personnel Board and Filing an EEOC Charge against the ABC Board (State of Alabama)", she alleges that she "was retaliated against for opposing discrimination, filing an internal complaint with the State Personnel Board and for filing an EEOC charge in the area of promotion, discipline, jobs and work assignments, transfers, and all other terms or conditions." (Doc. 6 ¶ 186). For the following reasons, the ABC Board's Motion for Summary Judgment on Perry's second count is due to be **GRANTED**.

### a.  Retaliatory Discrete Acts

Title VII prohibits retaliation in the employment context by making it "an unlawful employment practice for an employer to discriminate against any of his employees […] because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a). "A prima facie case of retaliation contains three elements: first, the plaintiff engaged in statutorily protected conduct; second, the plaintiff suffered an adverse employment action; and finally, the

adverse action was causally related to the protected expression." *Williams v. Motorola, Inc.*, 303 F.3d 1284, 1291 (11th Cir. 2002) (quotation omitted). An action is materially adverse if it might dissuade "a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006). In the past, the Eleventh Circuit has construed "the causal link element broadly so that a plaintiff merely has to prove that the protected activity and the adverse action are not completely unrelated." *Higdon v. Jackson*, 393 F.3d 1211, 1220 (11th Cir. 2004) (quotation, ellipsis, and alteration omitted). A causal connection has been established if the plaintiff shows that "the decision-makers were aware of the protected conduct, and that the protected activity and the adverse action were not wholly unrelated." *Gupta v. Fla. Bd. of Regents*, 212 F.3d 571, 590 (11th Cir. 2000) (quotations and alterations omitted). "For purposes of a prima facie case, close temporal proximity may be sufficient to show that the protected activity and the adverse action were not wholly unrelated." *Id.* (quotations omitted). Recently, the Supreme Court has declared that the ultimate issue is whether the retaliation would not have occurred but for the protected conduct. *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2534 (2013).

In this case, the Board concedes that Perry engaged in protected activity on May 3, 2010, when complaining to Goolsby that her pay disparity was based on race; on August 9, 2010, when she filed a Charge with the EEOC; on August 18, 2010, when she filed a discrimination complaint with the SPD; and on June 14, 2011, when she filed the complaint in this case. Perry alleges no other acts as specific protected activity.

*1. Failure to exhaust administrative remedies.*

The court will assume, without holding, that Perry sufficiently exhausted her administrative remedies in regard to her retaliation claims.

### 2. Perry's reprimand did not constitute an adverse employment action.

For similar reasons to those discussed above under Perry's disparate treatment claim, the written reprimand for the stated reasons of tardiness and insubordination after she had filed this suit is not an adverse employment decision warranting a finding of retaliation. Perry has failed to show any negative impact on her job associated with the reprimand, and thus she has failed to show that the reprimand was an adverse employment decision. While a formal reprimand can be an adverse employment action, the reprimand must still be accompanied by some tangible harm. *See Pennington v. City of Huntsville*, 261 F.3d 1262, 1267 (11th Cir. 2001) (stating that no adverse employment action is established for retaliation purposes when a reprimand is rescinded before a tangible harm occurs)[6]. Because some tangible harm must occur that would dissuade a reasonable employee from complaining of discrimination, and because Perry has not shown any tangible harm resulting from the reprimand, she has failed to establish a prima facie case as to the reprimand.   The Board's motion for summary judgment on this claim is due to be **GRANTED**.

### 3. Perry's instances of alleged retaliation, including, and resulting after, her transfer to District Ten, do not constitute adverse employment actions.

---

[6] The Eleventh Circuit continues to apply *Pennington* even after its decision in *Burlington*. *See, e.g.*, *Polite v. Dougherty Cnty. Sch. Sys.*, 314 F. App'x 180, 183 (11th Cir. 2008); *Rutledge v. SunTrust Bank*, 262 F. App'x 956, 958 (11th Cir. 2008).

As discussed above, an adverse action is only material if it might dissuade a reasonable worker from making or supporting a charge of discrimination. *Burlington N. & Santa Fe Ry. Co.*, 548 U.S. at 68. Such adverse actions must be accompanied by some tangible harm to the protected employee. *See Webb–Edwards v. Orange Cnty. Sheriff's Office*, 525 F.3d 1013, 1031 (11th Cir. 2008).

Perry claims that she was retaliated against after she was transferred to District Ten when she was questioned concerning her phone calls, asked to sign a statement promising not to remove documents from the office, and interrogated and advised regarding her relationship with an ex-agent. Perry has not shown any tangible harm resulting from these actions. An employee can be subjected to "petty slights, minor annoyances, and simple lack of good manners" without there being actionable discriminatory retaliation, *Burlington N. & Santa Fe Ry. Co.*, 548 U.S. at 68, and in this case, at most, that is the only manner in which these activities could be characterized. Because Perry did not suffer any tangible harm related to her work following these alleged harassments, there is no adverse employment action, and she has failed to establish a prima facie case in that regard.  Thus the Board's motion for summary judgment on these retaliation claims is due to be **GRANTED**.

Perry's transfer claim facially seems more promising, but it also fails to show an adverse employment action. She has not presented evidence showing that the transfer negatively impacted her career in a material way. *See Hall v. Dekalb Cnty. Gov't*, 503 F. App'x 781, 790 (11th Cir. 2013). By moving Perry closer to her home and her children's school, and by potentially placing her in a position to be promoted more readily to an ASA III, there appears to have been no negative impact on Perry's job at all. Moreover, Perry has not shown that the transfer to District Ten prevented her from attaining a new professional status or something of

that nature. Because Perry has failed to demonstrate an adverse employment action in her retaliatory transfer claim, she has failed to establish a prima facie case, and the Board's motion for summary judgment on that claim is due to be **GRANTED**.

### 4. *The three day suspension*

While Perry does not appear to argue that her three-day suspension was an act of retaliation, suspension would constitute an adverse employment action. However, the closest protected activity to that was the filing of this lawsuit. That occurred on January 11, 2012, nearly seven months earlier. For close temporal proximity to satisfy the causation element of the prima facie case, the time that the plaintiff's employer learns about the protected activity and the time of the subsequent adverse activity must be very close. *Raspanti v. Four Amigos Travel, Inc.*, 266 Fed. App'x 820, 823 (11th Cir. 2008). "A delay of 'three to four month[s]' does not suffice." *Id.* (quoting *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007)). For that reason, Perry has not established a prima facie case for retaliation based on her suspension, and the Board's motion for summary judgment is due to be GRANTED on that claim.

### 5. *The "but-for" test.*

Even if any of the alleged discrete acts of retaliation were sufficient to make out a prima facie case, they would not survive the "but-for" test.

Recently, the Supreme Court clarified what level of causation is required for Title VII cases, holding that a plaintiff alleging retaliation must show that the retaliation would not have occurred but for the plaintiff's involvement with protected activity. *Nassar*, 133 S. Ct. at 2534.

Thus, the plaintiff must show "'that the harm would not have occurred' in the absence of—that is, but for—the defendant's conduct." *Id.* at 2525 (citing, *inter alia*, Restatement of Torts § 431 cmt. a). As a result, the proper causation analysis no longer considers whether the protected conduct was a "motivating factor" in an adverse employment decision. *See id.* at 2534.

In response to the Board's arguments and evidence, Perry has not presented any evidence showing that the alleged retaliatory actions would not have occurred but for her protected conduct. *See Nassar*, 133 S. Ct. at 2534. Rather, the record evidence indicates that the actions would have occurred regardless of Perry's protected conduct. Specifically, Perry has not shown that, but for her protected conduct, she would not have been transferred. Instead, she has failed to refute her supervisors' contention that she would have been transferred regardless in order to position her for a promotion. Furthermore, she has not shown that the alleged retaliation over her phone calls, her relationship with the ex-agent, or the signed statement would not have occurred but for her protected conduct. Rather, with the signed statement and the relationship, the Board has asserted, and Perry has failed to refute, that these actions were related to an ongoing criminal investigation of Lard. In addition, Perry has failed to establish any causation between being asked to limit her telephone conversations and her protected conduct. Coupled with her supervisor's claim that her personal calls were disruptive to the work environment, Perry needed to show that this would not have occurred but for her protected conduct and not as a result of normal supervisory activities.

For the same reasons discussed above with Perry's claim of racially disparate disciplinary actions, Perry has not rebutted the Board's legitimate, nondiscriminatory reason for its disciplinary actions as to these claims. Specifically, the Board presented evidence that Perry was reprimanded for insubordination and tardiness, both legitimate reasons stemming from the

Board's management of the workplace. (Pl. Ex. 50.) Furthermore, the Board recommended the suspension due to Perry's consistent failure to abide by the workplace absence rules. (Def. Ex. 55.) As a result, the burden shifts to Perry to argue that the Board's proffered reasons for the discipline were pretext. Perry completely failed to argue or present any evidence showing that these reasons were pretextual.

For these reasons, even if the evidence on any of the claims based on alleged discrete acts of retaliation could be sufficient to establish a prima facie case, the court finds that summary judgment is still due to be **GRANTED** as to each of them.

### b.  Retaliatory Hostile Work Environment

As to Perry's argument regarding retaliatory hostile environment, just as the Board argues in regard to Aaron's claim, Perry did not include a retaliatory hostile work environment claim in her original complaint and thus it cannot be included in her opposition to the Board's Motion for Summary Judgment. Notably, Count I specifically alleges that the racial discrimination was in various areas "including a hostile environment," while the retaliation claim, this count, did not include that. This may be because it did not occur to the Plaintiff until a retaliatory hostile work environment claim was recognized in the Eleventh Circuit in 2012 in *Gowski v. Peake*, 682 F.3d 1299, 1312 (11th Cir. 2012), several months after the Second Amended Complaint was filed. Perry did not, however, move to amend to add such a claim. "[A] plaintiff cannot amend his complaint through argument made in his brief in opposition to the defendant's motion for summary judgment." *Miccosukee Tribe of Indians of Fla. v. United States*, 716 F.3d 535, 559 (11th Cir. 2013).

### c.  Count II Fails

For the reasons stated above, the Board is entitled to summary judgment on all claims made in Perry's Count II.

### B.  Valencia Aaron's Claims

### 1.  Count V

In Count V of the Second Amended Complaint, entitled "Plaintiff Valencia Aaron's Claims of Race Discrimination against the ABC Board (State of Alabama) in Violation of Title VII," Aaron alleges that she "has been discriminated against on the basis of her race and in violation of Title VII in promotions, pay, job and work assignments, discipline, evaluations and in all other terms and conditions including a hostile environment because of racial harassment by her employer, the ABC Board (State of Alabama)." (Doc. # 6 ¶ 192.) For the following reasons, the ABC Board's Motion for Summary Judgment on Aaron's Count V is due to be **GRANTED**.

### a.  Aaron's Failure to Promote Claims

#### 1.  Aaron's Promotion Claims other than Her Claim Related to Roberts' Promotion

As a preliminary matter, and as raised by the Board in moving for summary judgment, Aaron has failed to timely raise with the EEOC any promotion claims except for Roberts' promotion to sergeant in June of 2010. Aaron concedes in her Response Brief that her promotion claims arising from Chandler and Wilson's promotions are untimely under Title VII. (Doc. # 132 at 51 n.22.) Furthermore, as the Board points out, only the June 2010 promotion was mentioned in Aaron's EEOC complaints. Thus, any other promotions, whether before or after Roberts' promotion, have not been raised, and Aaron has failed to exhaust her administrative remedies as to other failure to promote claims. *United Air Lines, Inc. v. Evans*, 431 U.S. 553, 558 (1977) ("A discriminatory act which is not made the basis for a timely charge is the legal equivalent of a discriminatory act which occurred before the statute was passed. It may constitute relevant background evidence in a proceeding in which the status of a current practice is at issue, but separately considered, it is merely an unfortunate event in history which has no present legal consequences."). Therefore, any claims for promotions that preceded or followed Roberts' promotion fail, and the Board's Motion for Summary Judgment on any such claims is due to be **GRANTED**. The court now addresses Aaron's claim based on Roberts' promotion.

### 2. *Aaron's Claim Related to Roberts' Promotion*

For the purposes of this Motion for Summary Judgment, the Board concedes that Aaron can meet her prima facie case for her claim on Roberts' promotion. That said, however, the Board asserts that Aaron has not and cannot rebut the Board's legitimate, nondiscriminatory reason for choosing Roberts over Aaron for the Enforcement Training Coordinator position.

As its legitimate, nondiscriminatory reason for choosing Roberts for the enforcement training coordinator position, the Board pointed to the relative qualifications of Roberts that made him a more attractive choice for the position than Aaron. Specifically, in a memorandum from Rogers to Goolsby, Rogers sets out the following reasons for selecting Roberts for the position: nine years of police firearm certification; five years of investigative experience with the Montgomery Police Department; four and a half years as a certified FBI firearms instructor; experience in multiple districts as an ABC Agent; experience as a lead firearms instructor for the ABC, including supervisory experience over eighteen other firearms instructors; and experience with the ABC Drug Unit. (Doc. # 101-3 at 47.) In addition, Rogers said that he personally assigned Roberts to his agent positions and that, during Roberts' involvement as an agent, Rogers heard little or no criticism of Roberts' job performance. (*Id.*) Furthermore, Aaron admits that she lacked the same level of firearms training as Roberts. (Doc. # 101-12 at 109:17–21.) While subjective preference alone can be a legitimate, nondiscriminatory reason for choosing a candidate for a supervisory or professional position, *Springer*, 509 F.3d at 1349, it is clear here that the chosen candidate had concrete, objective firearm qualifications and supervisory experience over firearms instructors that made him a better choice. Included in the Board's evidence is an affidavit from Aaron's supervisor at the time, James Collins, African-American, stating that he too would have selected Roberts, based on his superior qualifications. (Doc. # 101-1 ¶ 4.) Because the Board articulated a legitimate, nondiscriminatory reason by arguing that it chose a firearm training instructor with more firearm training and experience than Aaron, the burden shifts to Aaron to show pretext.

Aaron fails to show that the Board's legitimate, nondiscriminatory reason for choosing Roberts as the enforcement training coordinator was pretext for discrimination. In arguing this

point, Aaron discusses the Board's alleged past manipulation of the promotion registry. In particular, she states that "Roberts was assigned acting sergeant duties which (1) indicates that he was selected for promotion and (2) which arguably enhanced his score and placement on the register." (Doc. # 132 at 53.) What Aaron's argument fails to show, however, is how exactly those duties possibly enhanced his promotion score. Instead, Aaron only provides one page of Roberts' examination application for the sergeant position. (Doc. # 130-3 at 8.) This one-page document does not establish anything concerning Roberts' duties. Furthermore, even if Roberts was hand-selected for promotion, Aaron has failed to show any discriminatory intent. Rather, with Roberts' past experience with firearms training, a promotion to the ETC appears to be a predictable outcome. Finally, even if some favoritism was shown to Roberts, favoritism alone is not evidence of racial discrimination. *See Coutu*, 47 F.3d at 1074. Aaron needed to show discriminatory animus. Because she has failed to do so, and because she has not shown "such weaknesses, implausibilities, inconsistencies or contradictions" in the Board's proffered legitimate, nondiscriminatory reason for promoting Roberts over Aaron, the Board's Motion for Summary Judgment on that claim is due to be **GRANTED**. *Cooper*, 390 F.3d at 725; *Reeves*, 530 U.S. at 148–49.

### b.  Aaron's Other Disparate Treatment Claims

Apart from the vague claims set forth in her Second Amended Complaint, Aaron does not argue or address the Board's arguments concerning her remaining disparate treatment claims. Specifically, the Board states that Aaron "fail[ed] to address any of the ABC Board's arguments with respect to other claims of disparate treatment she alleged in her Second Amended

Complaint relating to surveillance, discrimination with respect to performance evaluation, discrimination with respect to job assignments, […] discrimination with respect to pay[, and] pregnancy discrimination." (Doc. # 139 at 7.) After reviewing Aaron's brief, this court agrees with the Board. Aaron has not presented any evidence or argument on those claims to oppose the Board's well-supported Motion for Summary Judgment. She has not rebutted the Board's arguments concerning whether she has comparators, whether she exhausted her administrative remedies, or whether the alleged employment actions were adverse. *Celotex Corp.*, 477 U.S. at 322 (explaining that, after the moving party demonstrates the absence of a genuine issue of material fact, the nonmoving party must "go beyond the pleadings" and show that there is a genuine issue for trial). Thus, these claims are deemed abandoned, and summary judgment is due to be **GRANTED** for the Board on those claims. *See Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995).

### c. Aaron's Hostile Work Environment Claim

Aaron largely collapses her racially hostile work environment claim and a retaliatory hostile work environment argument into the same analysis. However, Count V is based only on race, and Count VI, which is Aaron's retaliation claims, does not include a claim for retaliatory hostile work environment. In presenting its argument on Aaron's racially hostile work environment claim, the Board takes issue with the fourth and fifth elements of the hostile work environment prima facie case. This court only addresses the fourth element.[7] For the reasons

---

[7] As with Perry, above, the Board argues that none of the identified individuals were "supervisors" for Title VII liability. However, as with Perry, Aaron's hostile work environment

stated below, the Board's Motion for Summary Judgment on Aaron's Title VII hostile work environment claim is due to be **GRANTED**.

As pieced together from the submissions of both parties, Aaron has not pointed to sufficient harassment from which a reasonable jury could conclude that there was a sufficiently severe or pervasive level of racial harassment in the workplace to support this claim. With regards to explicitly racist remarks or indicia, Aaron was aware of the same instances as Perry. She heard Folmar once refer to an African-American male as "working like a little monkey" in the warehouse, but she could not remember at what time. (Doc. 128-1 at 449:20–23.) Folmar's comment is the only instance of racially antagonistic language that Aaron said was made in her presence. Hatfield said that he had heard warehouse employees use the "n-word," but he could not remember the exact context of the slurs or at what times they were used. (Doc. # 128-6 at 126:3–13.) Similarly, Hatfield recalls Rogers using racial slurs, but he could not remember the context, times, or frequency of those situations either. (Doc. # 128-6 at 126:17–128:4.) Moreover, Hatfield heard Folmar use racial slurs, but he could not remember at what time. (Doc. # 128-6 at 199:2–7.) Hatfield did say that he remembered Folmar commenting that Richardson was hired to communicate with African-American legislators, but he did not say when Folmar made this comment. (Doc. # 128-6 at 70:11–71:14.) Rogers admitted to using racial slurs, but said it was not habit or custom. (Doc. # 128-4 at 84:23–85:13.) The only specific instance Rogers recalled of using a racial slur consists of a recollection, substantiated by Hill, that he used the "n-word" in reference to an African-American female job applicant sometime in 2010. (Doc. 128-4 at 85:14–89:11; Doc. 128-8 at 12:3–22.) Rogers also used the "n-word" when quoting a line from a movie to McKitt. (Doc. #139-2 ¶ 12.) Hill also heard Rogers say that the Plaintiffs in this

claim fails for another reason, and the court thus does not need to determine who the supervisors were in this case.

case were "N words [who] wanted something for nothing." (Doc. # 128-8 at 17–19.) Turner heard Rogers use the "n-word" once without mentioning a specific time, and she said the word was only used at Perry's request in quoting a story Perry had told. (Doc. 128-5 at 205:2–7.) In reference to an investigation concerning alcohol stolen from the ABC warehouse, Holston said Folmar stated "he wanted the [n-word] hung from a light pole," but he did not mention a specific time at which Folmar made this statement. (Doc. # 128-1 at 453:2–10.) Perry said that she saw Confederate battle flags on personal vehicles but she did not mention at what times. (Doc. # 128-3 at 130:7–13.) Perry also heard a reference to the Ku Klux Klan during a conversation about the "n-word" with Goolsby and another ABC employee, but she did not mention on what date this conversation happened. (Doc. # 128-3 at 130:7–131:16.) Parker testified that she heard Rogers say that District Ten was becoming "too dark" when discussing where to place a new African-American recruit, but Parker did not specify the exact date of this comment. (Doc. # 128-7 at 38:2–8.) She also said Rogers did not want her to consider an African-American female applicant too favorably "because she had a reputation of being one of those uppity black bitches." (Doc. #128-7 at 82:21–83:5.)

As other instances of alleged harassment, Aaron identifies several examples in her statement of the facts. She argues that the extension of her probation period in June of 2006 was discrimination. (Doc. # 132 at 9.) She claims that the delay from November of 2006 to March of 2007 in approving her request to transfer to District Ten was discriminatory. (Doc. # 132 at 10.) Aaron believes she was discriminated against with selections to the training task force during her time with the Drug Unit, from March of 2007 to June of 2008. (Doc. # 132 at 11.) From that same timeframe, she claims that the security detail assignments, and specifically the subsequent promotional advantages from those details, were discriminatory. (Doc. # 132 at 11–12.) She

states that the permanent move from the Drug Unit during and after her pregnancy in 2008 was discriminatory. (Doc. # 132 at 12–13.) Finally, she points to a change in the office's breakfast rules on December 17, 2010 as discriminatory. (Doc. # 132 at 36.) Despite these allegations in the facts, however, she makes no later attempt at connecting these statements to arguments in her brief.

Aaron also says that she was aware of other parties' harassment and that this contributed to her own hostile work environment experience. Specifically, she was concerned over Hill's removal after Hill complained that Taylor and McKitt were assigned to warehouse duties because of their race. In addition, she points to Turner's decision to discipline Taylor and McKitt for not having sufficient cases despite not allowing agents to leave the office to make new cases. Furthermore, she was concerned about Holston arriving in the office to watch over everyone. Aaron cites her contention of Rogers' practice of pre-selecting individuals for promotions and Goolsby's apparent acquiescence in this scheme. Finally, she knew of Lard's arrest and Perry's interrogation because Rogers and Josh Law's investigations had been covered up. In sum, all of this, to Aaron, meant that "[t]he African-American employees of the ABC Board reasonably and correctly felt they were under siege." (Doc. # 132 at 69.)

After considering all of the evidence presented to the court, these alleged instances do not constitute the level of severe or pervasive harassment necessary to support a hostile work environment claim. In particular, while she subjectively perceived her work environment to be racially hostile, she has not shown that the alleged harassment was objectively severe or pervasive. Concerning the instances of racist language and indicia, Aaron personally witnessed only a very few racist remarks, and, while having been told by others of several other instances, the other comments listed by both parties represent only sporadic, isolated incidents. In the

aggregate, Aaron has not shown that the racist remarks were frequent. Moreover, she has not shown that they were physically threatening or humiliating nor that they interfered with her job performance. Instead, the racist language in this case consists of isolated, sporadic instances of mere offensive utterances, and as such Aaron has not succeeded at using this as a basis for her hostile work environment claim. *Faragher*, 524 U.S. at 788.

Furthermore, even when the racist language is taken into account with Aaron's scattered allegations of harassment, she still has not shown a sufficiently severe or pervasive level of harassment. Instead, once again, she fails to show how these events combined to form an objectively reasonable perception of severity or pervasiveness. "[T]o be actionable, [the] behavior must result in both an environment that a reasonable person would find hostile or abusive and an environment that the victim subjectively perceives to be abusive." *Id.* (internal quotations and alterations omitted). In examining objective severity, the court considers "(1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance. *Id.* As the Supreme Court has stated "teasing, offhand comments and isolated incidents do not constitute discriminatory changes in the terms and conditions of employment." *Satchel v. Sch. Bd. Of Hillsborough Cnty.*, 251 F. App'x 626, 630 (11th Cir. 2007) (citing *Faragher v. City of Boca Raton*, 524 U.S. 755, 788 (1998)). The inquiry is whether "[a] jury reasonably could find [...] that a meaningful portion of the allegedly offensive conduct in the office contributed to conditions that were humiliating and degrading [...] and therefore may have created a discriminatorily abusive working environment." *Reeves v. C.H. Robinson Worldwide, Inc.*, 594 F.3d 798, 811 (11th Cir. 2010).

The instances of harassment in this case were spread out over at least four and a half years. Furthermore, none of these instances were physically threatening or humiliating to Aaron. In addition, she has not explained how these instances were objectively severe. For example, there is no discussion of how the extension of her probation period was somehow severe, nor is there any indication of the severity attached to Hill's removal from District Ten. Finally, Aaron does not indicate in any way whether the alleged instances unreasonably interfered with her job performance. Instead, the only evidence presented by both parties indicates that Aaron did not have any obstructions to her job performance based on her race. Based on these factors, Aaron has not shown that the alleged harassment constituted objectively severe or pervasive harassment that altered the terms or conditions of her employment. Thus, Aaron's hostile work environment claim fails, and the Board's Motion for Summary Judgment on that claim is due to be **GRANTED**.

## 2. Count VI: Retaliation

In Count Six of Aaron's Second Amended Complaint, entitled "Plaintiff Valencia Aaron's Claims of Retaliation for Opposing Discrimination[,] Filing an Internal Complaint with the State Personnel Board and Filing an EEOC Charge against the ABC Board (State of Alabama)," Aaron states that she "was retaliated against for opposing race and sex discrimination, filing an internal complaint with the State Personnel Board and for filing an EEOC charge in the area of discipline, jobs and work assignments, promotions, transfers, and all other terms or conditions of employment." (Doc. # 6 at 25.) Aaron does not argue any other

bases for retaliation other than a retaliatory hostile work environment. (Doc. # 132 at 57.)[8] Thus, any claim relating to discrete retaliatory acts is deemed to have been abandoned. *See Resolution Trust Corp.*, 43 F.3d at 599.

As to Aaron's argument regarding retaliatory hostile environment, for the same reasons set out as to Perry, Aaron has no such claim. Thus, the Board is entitled to summary judgment on Count VII.

### C.  Stacy D. Taylor's Title VII Claims

Plaintiff Taylor sets out two separate general Title VII claims for relief in his Second Amended Complaint. Although Taylor's counts are vague, this court has gleaned the following causes of action from his complaint.

### 1.  Count IX

In Taylor's Count IX of the Second Amended Complaint, entitled "Plaintiff Stacy D. Taylor's Claims of Race Discrimination against the ABC Board (State of Alabama) in Violation of Title VII", he alleges that he "has been discriminated against on the basis of his race and in violation of Title VII in promotions, pay, job and work assignments, discipline, constructive discharge, evaluations and in all other terms and conditions including a hostile environment because of racial harassment by his employer, the ABC Board (State of Alabama)." (Doc. # 6 ¶

---

[8] On that page, Aaron states that "[t]he adverse action which affected the terms and conditions is the racial harassment and retaliatory harassment which constituted a hostile work environment." Furthermore, in a footnote, she says she "is not attempting to obtain relief for discrete incidents which occurred outside the statute of limitations." (Doc. # 132 at 57 n.24.)

200.) For the following reasons, the ABC Board's Motion for Summary Judgment on Taylor's ninth count is due to be **GRANTED**.

### a.   Taylor's Failure to Promote Claim

As a preliminary matter, as raised by the Board in moving for summary judgment, Taylor's promotion claims in this case are due to be dismissed because he failed to timely raise them in an EEOC Charge. Taylor only affirmatively argues a promotion claim based on comparing white agents Chandler and Wilson's promotions. Taylor concedes in his brief that this claim is not timely for a Title VII claim, and he states that he only asserts it as to Rogers under § 1981 through § 1983. (Doc. # 138 at 40 n.28.) Therefore, the Board's Motion for Summary Judgment on that claim is due to be **GRANTED** under Title VII, and this will be discussed later as to the claim against Rogers individually.

### b.   Taylor's Disparate Pay Claim

In this case, Taylor makes no separate argument concerning disparate pay. He does not point to any evidence supporting a disparate pay claim. Furthermore, Taylor admitted in his deposition that he is not making any claims concerning his pay while at the ABC Board. (Doc. # 137-1 at 162:5–15.) In the face of the Board's well-supported motion as to this claim, Taylor has pointed to no evidence, and therefore the Board's Motion for Summary Judgment on the disparate pay claim is due to be **GRANTED**.

### c.  Taylor's Other Race Discrimination Claims

Taylor has alleged that he received different evaluations, assignments, and discipline on account of his race. The Board does not contest Taylor's assertion that he is in a protected class nor that he was qualified to do the particular job.

#### 1.  *Taylor's disparate discipline claim concerning his June 2009 suspension was not timely raised in an EEOC Charge.*

Taylor's first contact with the EEOC was, at the earliest, on December 9, 2009. He first filed a Charge with the EEOC on February 18, 2010. Even if the applicable time for determining the 180-day requirement were the earlier December date when he first contacted the EEOC, Taylor would still have missed the 180-day cutoff to report his June 2009 suspension. As such, Taylor has failed to timely file with the EEOC, and thus his discriminatory suspension claim fails. *Pijnenburg*, 255 F.3d at 1305. Thus, the Board's Motion for Summary Judgment on that claim is due to be **GRANTED**.

#### 2.  *Taylor's new work assignments did not constitute adverse employment actions.*

Taylor argues that he was discriminated against with work assignments on two levels. First, he argues that he was discriminated against because he was denied assignments that would have positioned him for a reallocation from agent to sergeant. Specifically, he points to Chandler and Wilson, two agents who received additional duties from Rogers and who were subsequently

promoted. Second, he argues that he was discriminated against with his warehouse and driving assignments.

### a. Assignments compared to Chandler and Wilson

As a preliminary matter, the Board argues that the Second Amended Complaint did not allege any discrimination with regards to the assignment of additional duties to Chandler and Wilson and that this claim cannot be included at the summary judgment stage. However, construing the Second Amended Complaint for the purposes of this motion, this court finds that, under the particular circumstances of this case, the Second Amended Complaint could include a claim for intentional discrimination with favorable work assignments. In the Second Amended Complaint, Taylor alleges that he was discriminated against in his job and work assignments on the basis of his race. (Doc. # 6 ¶ 200.) Moreover, the Second Amended Complaint asserts that "[d]uring Taylor's tenure as an agent, he was passed over for promotions to sergeant when Derrick Wilson, Scotty Chandler, Jason Roberts and other white males were promoted." (Doc. # 6 ¶ 172.) Also, the Second Amended Complaint alleges that "Taylor and other Blacks were as qualified or more qualified than the white candidates." (*Id.*) This court finds that these statements, coupled with subsequent discovery, gave the Board fair notice of a potential claim into any job and work assignments pertaining to Taylor, whether given, received, or denied, and how they pertained to subsequent promotion decisions. *See Twombly*, 550 U.S. at 555. However, this claim fails for other reasons.

Just as with Taylor's claim of failure to promote to positions given to Chandler and Wilson, any claim based on job assignments leading up to those promotions is time-barred for a Title VII claim.

### b. Warehouse and driving assignments

Second, Taylor fails to address his discriminatory warehouse and driving assignments claim as a discrete discriminatory act in the context of Title VII. While he argues that the warehouse was hot and dirty and was thus considered a punitive assignment, he does not identify any other evidence showing how the warehouse assignment was a serious and material adverse employment action. The same reasoning applies with his driving claims. Taylor only mentions that he was asked to drive an African-American senator and ABC captain. He does not identify any serious and material change associated with this assignment. As such, Taylor has not satisfied the prima facie case with his discriminatory assignments claims.

Even if a material adverse employment action were assumed, Taylor has not presented any evidence to rebut the legitimate, nondiscriminatory reason for the warehouse and driving assignments. The Board submitted evidence that warehouse security was part of the duties that all ABC Enforcement Agents are assigned to perform to prevent thefts, and also that white agents provided security for legislators and dignitaries. This court agrees that the uniform application of driving and warehouse assignments is a legitimate, nondiscriminatory reason for giving Taylor such assignments. Thus, the burden shifts to Taylor to rebut this reason, and he completely fails to submit evidence to support a finding that the proffered reason is pretext. He states in his brief that he worked in the warehouse more than white agents who had lower

statistics, but he fails to show the frequency with which white agents were assigned to the warehouse or the white agents' actual job performance numbers. Because Taylor had the burden of showing the Board's legitimate, nondiscriminatory reason to be pretextual, and because he completely failed to do so, Taylor's discriminatory driving and warehouse assignments claim fails.

### c.  No basis for Title VII discrete assignments claims

For these reasons, any Title VII claims based on these actions fail to survive summary judgment.

### 3.  Taylor has not identified any issues with his evaluations, including any adverse employment actions related to the evaluations.

Apart from the Second Amended Complaint, Taylor does not identify any problems related to his evaluations. In his deposition, he admitted that he had no problems with his evaluations, with the exception of the ancillary issue of mandatory disciplinary deductions. (Doc. # 137-1 at 162:18–163:5.) In the face of the well-supported Motion for Summary Judgment on this claim, he does not point to any evidence of a serious and material change in his employment resulting from his evaluations. In fact, Taylor does not seem to argue this claim at all. As such, his claim for discriminatory evaluations fails, and the Board's Motion for Summary Judgment on this claim is due to be **GRANTED**.

> ### 4.   Taylor has not shown any serious and material change in the terms and conditions of his employment resulting from the November written warning.

Taylor claims that the two written warnings he received—one for a failure to maintain his state-issued car when a dent was discovered in a door, and another for inadequate job performance—were discriminatory. However, Taylor has not shown any serious and material change in his employment resulting from the November warning for failing to maintain his state-issued car. Because Taylor had the burden of showing his prima facie case, and because he has not identified any evidence to support a finding that the warning resulted in a tangible, adverse change in his employment conditions, the Board's Motion for Summary Judgment on that claim is due to be **GRANTED**. In addition, Taylor has failed to show that the Board's proffered reason of a uniform policy in this regard, including evidence of warning a white agent because of stains on a car seat, was pretext for racial discrimination.

> ### 5.   December warning for inadequate job performance

As part of Taylor's December 2009 warning for inadequate job performance, Taylor was recommended for transfer to District Nine. This court assumes, without deciding, that Taylor established a material adverse employment action in his Title VII claim on the December 2009 warning. However, as discussed below, his prima facie case on that claim fails for other reasons.

As argued by the Board in discussing the December 2009 warning, Taylor has not shown any racial animus associated with the warning and transfer decision. Furthermore, Taylor has not identified any white comparators who were treated more favorably. Finally, the Board proffered the legitimate, nondiscriminatory reason that Taylor's transfer was one of several transfers used

to remedy disciplinary or performance issues. Included in those transfers were several white agents. (Doc. # 101-7 ¶ 11.) Taylor has not argued or shown any evidence as to how this uniform policy of transferring agents for disciplinary or performance issues was discriminatory, and as such this claim fails.

### d.  Hostile Work Environment

The Board argues that Taylor cannot establish the fourth or fifth elements of the prima facie hostile work environment case.[9] The court examines only the fourth element—severity or pervasiveness—here.

The requirement that the harassment be sufficiently severe or pervasive contains both an objective and subjective element. *Id.* "Thus, to be actionable, this behavior must result in both an environment that a reasonable person would find hostile or abusive and an environment that the victim subjectively perceives to be abusive." *Id.* (internal quotations and alterations omitted). In examining objective severity, the court considers "(1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance. *Id.* As the Supreme Court has stated "teasing, offhand comments and isolated incidents do not constitute discriminatory changes in the terms and conditions of employment." *Satchel v. Sch. Bd. Of Hillsborough Cnty.*, 251 F. App'x 626, 630 (11th Cir. 2007) (citing *Faragher v. City of Boca Raton*, 524 U.S. 755, 788 (1998)).

---

[9] As with Perry, above, the Board argues that none of the identified individuals were "supervisors" for Title VII liability. However, as with Perry, Taylor's hostile work environment claim fails for another reason, and the court thus does not need to determine who the supervisors were in this case.

In addition to the various discrete acts of alleged racial discrimination discussed above, Taylor alleges other things as having created a racial hostile work environment while he was at the ABC Board. From the submissions of the parties, the court has pieced together all of Taylor's alleged instances of harassment that could constitute a racially hostile work environment. With regards to explicitly racist remarks or indicia, Taylor raised the same instances as Perry. Aaron heard Folmar once refer to an African-American male as "working like a little monkey" in the warehouse, but she could not remember at what time. (Doc. 128-1 at 449:20–23.) Hatfield said that he had heard warehouse employees use the "n-word," but he could not remember the exact context of the slurs or at what times they were used. (Doc. # 128-6 at 126:3–13.) Similarly, Hatfield recalls Rogers using racial slurs, but he could not remember the context, times, or frequency of those situations either. (Doc. # 128-6 at 126:17–128:4.) Moreover, Hatfield heard Folmar use racial slurs, but he could not remember at what time. (Doc. # 128-6 at 199:2–7.) Hatfield did say that he remembered Folmar commenting that Richardson was hired to communicate with African-American legislators, but he did not say when Folmar made this comment. (Doc. # 128-6 at 70:11–71:14.) Rogers admitted to using racial slurs, but said it was not habit or custom. (Doc. # 128-4 at 84:23–85:13.) The only specific instance Rogers recalled of using a racial slur consisted of a recollection, substantiated by Hill, that he used the "n-word" in reference to an African-American female job applicant sometime in 2010. (Doc. 128-4 at 85:14–89:11; Doc. 128-8 at 12:3–22.) Hill also heard Rogers say that the Plaintiffs in this case were "N words [who] wanted something for nothing." (Doc. # 128-8 at 17–19.) Turner heard Rogers use the "n-word" once without mentioning a specific time, and she said the word was only used at Perry's request in quoting a story Perry had told. (Doc. 128-5 at 205:2–7.) In reference to an investigation concerning alcohol stolen from the ABC warehouse, Holston said Folmar stated

"he wanted the [n-word] hung from a light pole," but he did not mention a specific time at which Folmar made this statement. (Doc. # 128-1 at 453:2–10.) Perry said that she saw Confederate battle flags on personal vehicles but she did not mention how many or at what times. (Doc. # 128-3 at 130:7–13.) Perry also heard a reference to the Ku Klux Klan during a conversation about the "n-word" with Goolsby and another ABC employee, but she did not mention on what date this conversation happened. (Doc. # 128-3 at 130:7–131:16.) Parker testified that she heard Rogers say that District Ten was becoming "too dark" when discussing where to place a new African-American recruit, but Parker did not specify the exact date of this comment. (Doc. # 128-7 at 38:2–8.) She also said Rogers did not want her to consider an African-American female applicant too favorably "because she had a reputation of being one of those uppity black bitches." (Doc. #128-7 at 82:21–83:5.) A warehouse supervisor, whose name Taylor could not remember, told Taylor that Folmar liked to use slurs, but the supervisor did not tell Taylor which slurs, at what times, and in what context. (Doc. # 103-17 at 39:9–40:11.) However, despite saying in his brief that he was aware of these instances, Taylor admits that he never personally heard any racial slurs or jokes, nor did he ever see any overt indicia of racism at the office. (Doc. # 137-1 at 71:4–73:16.) He did not become aware of most of the alleged slurs until after his employment ended. (Doc. # 137-1 at 255:6–256:3.)

Taylor also points to alleged disparate treatment received by African-Americans, and especially himself, as evidence of a racially hostile work environment. (Doc. # 138 at 53–55.) Taylor claims the Board harassed him when he was assigned to work at the warehouse for a week in December 2008 as punishment for not having made enough cases. (Doc. # 137-1 at 189:11–17.) A white agent, Mark Barber, was ranked lower overall than Taylor and had not been assigned to the warehouse, but Barber had also made more cases than Taylor. (Doc. # 137-

27 at 3.)[10] The Board's practice of "preselecting individuals for promotion without an open and competitive selection process," and especially as this practice contributed to Chandler and Wilson's promotions in 2009, contributed to the overall racially hostile work environment. (Doc. # 138 at 55–56; Doc. # 137-13 ¶ 20.) On June 9, 2009, Taylor was given a two-day suspension for not reporting to his supervisor an unusual incident involving his girlfriend and ex-wife, but Taylor had told his immediate supervisor, Hill, of the incident. (Doc. 137-13 ¶¶ 27–28.) Collins told Taylor that Turner criticized Taylor's work continually, but Turner never criticized Taylor directly. (Doc. # 137-1 at 126:2–131:10.) In his deposition, Taylor stated that the November 2009 warning for having a dent in his state-issued vehicle's door was harassment that contributed to the racially hostile working environment. (Doc. # 137-1 at 70:4–23.) Taylor also says that, while Turner supervised the office, she would not let the agents leave the office to make new cases, but she still transferred Taylor to Dothan as discipline for not making enough cases. (Doc. # 137-13 ¶¶ 39–42.) Taylor says he knew that Holston told Aaron that "he knew people thought he was a 'mole' and [at District Ten] to 'snitch' on other employees." (Doc. # 137-13 ¶ 33.) Finally, Taylor says he was generally aware of how McKitt and Aaron were treated while Turner was at District Ten and that this contributed to his personal racially hostile work environment. (Doc. # 137-13 ¶¶ 32–37.)

Based on these allegations, Taylor has not argued a severely or pervasively hostile environment as required by the Eleventh Circuit. Instead, the events complained of stretch over a number of years, were sporadic, and are not specifically identified with evidence showing racial animus. "Isolated incidents (unless extremely serious) will not amount to discriminatory changes

---

[10] As the Board points out, on that page, Barber is listed at number 57 on the rankings sheet, but he had made a total of twelve cases (seven alcohol cases and five drug cases). By contrast, Taylor is listed at number 43 on the rankings sheet, but he made a total of eleven cases (five alcohol cases, three tobacco cases, two "other" cases, and one store case).

in the 'terms and conditions of employment.'" *Faragher*, 524 U.S. at 788. Furthermore, any racial slurs made after he left the ABC Board cannot have contributed to his alleged racially hostile work environment. *Edwards v. Wallace Cmty. Coll.*, 49 F.3d 1517, 1522 (11th Cir. 1995). Moreover, Taylor has not shown how the harassment was objectively severe or pervasive. None of the alleged statements were made towards Taylor, and thus they were not physically threatening or humiliating. Taylor could not remember in his deposition whether Turner's actions interfered with his job. (Doc. # 137–1 at 410:2–415:22, 417:2–20.) There is no indication of any of the other actions having unreasonably interfered with Taylor's work. Taylor has not identified any level of severity associated with any of the actions. Taylor has failed to show the sufficiently severe or pervasive level of harassment necessary to have an objectively material alteration in the terms or conditions of employment, and the Board's Motion for Summary Judgment on Taylor's hostile work environment claim is due to be **GRANTED**.

### e.   Constructive Discharge

As a preliminary matter, Taylor's constructive discharge claim was not timely raised in an EEOC Charge. Taylor did not mention a constructive discharge until his October 5, 2010 Amended Charge with the EEOC. The October Amended Charge was significantly outside of the 180-day time period for filing with the EEOC. Moreover, the constructive discharge claim was not "like or related to" the original EEOC complaint. *Gregory*, 355 F.3d at 1280. Instead, the only facts that Taylor mentioned in his February 2010 Charge concerned the alleged discrimination ending on December 8, 2009. There are no facts related to his subsequent resignation. Thus, the Board would not have been on notice of the subsequent claim, the EEOC

could potentially have had additional success garnering voluntary compliance from both parties, and the purpose of the filing requirement could still have been achieved. Strictly enforcing the EEOC exhaustion requirements furthers Congress' intent of "encourag[ing] the prompt processing of all employment discrimination charges." *Mohasco Corp. v. Silver*, 447 U.S. 807, 825 (1980); *see also Beverly v. Lone Star Lead Constr. Corp.*, 437 F.2d 1136, 1139 (5th Cir. 1971)[11] (stating "[w]e do not think the parties should be allowed to bypass [the administrative remedies available from the EEOC]"). Thus, because the constructive discharge claim was not reported to the EEOC until more than 180 days after the alleged discharge, the claim was not timely raised.

Even if Taylor's constructive discharge claim were not untimely, it would fail for other reasons. "'Constructive discharge occurs when an employer deliberately makes an employee's working conditions intolerable and thereby forces him to quit his job.'" *Bryant v. Jones*, 575 F.3d 1281, 1298 (11th Cir. 2009) (quoting *Munday v. Waste Mgmt. of N. Am., Inc.*, 126 F.3d 239, 244 (4th Cir. 1997)). "A plaintiff must show 'the work environment and conditions of employment were so unbearable that a reasonable person in that person's position would be compelled to resign.'" *Id.* (quoting *Virgo v. Riviera Beach Assoc.*, 30 F.3d 1350, 1363 (11th Cir. 1994)). Constructive discharge claims are more onerous to prove than hostile work environment claims. *Id.*; *see also Davis v. Dunn Constr. Co.*, 872 F. Supp. 2d 1291, 1319 (N.D. Ala. 2012) (stating that, "because Plaintiff has failed to establish the existence of a hostile work environment, he cannot as a matter of law establish that a constructive discharge occurred"). The claim must be connected to some prohibited discrimination or retaliation. *Cowan v. Jackson*

---

[11] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the Fifth Circuit, including Unit A, handed down prior to October 1, 1981.

*Hosp. & Clinic, Inc.*, 572 F. Supp. 2d 1286, 1292 (M.D. Ala. 2008). The court has held that Taylor has failed to establish a racially hostile work environment within the requirements of the law.

In this case, Taylor has not shown that the work environment and conditions of his employment were so unbearable that a reasonable person would have felt compelled to resign under the same circumstances. Taylor argues that the pending transfer and its attendant financial and personal difficulties forced him to resign. However, it is undisputed that Taylor never emailed or spoke with Rogers about the hardships that would arise from the transfer. Taylor does say he tried reaching Rogers on his cell phone once, but there is no indication that he tried any other time. Moreover, he waited nearly two months after finding out about the transfer before tendering his resignation. Finally, after turning his resignation letter in, he tried almost immediately to rescind it. Based on these facts, Taylor did not act as though his employment conditions were intolerable such that a reasonable person would not be able to remain at work. Rather, and especially because he attempted to rescind his letter almost immediately, Taylor's conduct appears to be that of someone who wanted to continue working at the Board. Moreover, Taylor's hostile work environment claim fails. Thus, Taylor has not shown that the conditions of his employment were so unbearable that a reasonable person would have felt compelled to resign, and his constructive discharge claim fails.

## 2.  Count X

In Taylor's tenth count of his Second Amended Complaint, entitled "Plaintiff Stacy D. Taylor's Title VII Claims of Retaliation for Opposing Discrimination by Complaining of

Discriminatory Job Assignments, Promotions, Termination, and Discipline against ABC Board",

he alleges that he "was retaliated against for opposing race discrimination by being subjected to

discriminatory job assignments, discipline, jobs and work assignments, transfers, termination,

and all other terms or conditions of employment." (Doc. # 6 at ¶ 202.) For the following reasons,

the ABC Board's Motion for Summary Judgment on Taylor's tenth count is due to be

**GRANTED**.


### a.  Taylor's retaliation claim was not timely raised with the EEOC.


The most proximate protected action to the end of Taylor's employment with the Board

was the filing of the first EEOC charge, and there was no mention in that Charge of any

retaliation claim based on anything earlier. Furthermore, Taylor's Amended Charge was too late

for raising the acts surrounding his resignation and refusal to let him withdraw it. As such,

Taylor's retaliation claim was not timely raised with the EEOC. However, even if Taylor's

retaliation claim were timely, it would fail for other reasons.


### b.  Taylor has not shown that Turner or Rogers knew of the EEOC intake questionnaire prior to Taylor's notice of transfer and subsequent resignation.


Taylor has failed to show that Turner or Rogers knew of the EEOC intake questionnaire

prior to Turner advising him that he would be transferred to Dothan, Rogers' agreement to the

transfer, and Taylor's subsequent resignation. "In order to show [the protected conduct and the

adverse employment action] were not entirely unrelated, the plaintiff must generally show that

the decision maker was aware of the protected conduct at the time of the adverse employment

action." *Brungart v. BellSouth Telecomms., Inc.*, 231 F.3d 791, 799 (11th Cir. 2000). "A decision maker cannot have been motivated to retaliate by something unknown to him." *Id.* In this case, the only evidence that has been presented is that Goolsby knew about the intake questionnaire but did not tell Turner or Rogers, the decision-makers. Taylor has not presented any evidence, direct or circumstantial, to counter this evidence. Finally, it is worth noting that Taylor implies that he is not accusing Turner or Rogers of retaliation at all; instead, he only mentions that he is accusing Goolsby of retaliation. (Doc. # 138 at 2.) There is no evidence, however, that Goolsby was involved in the transfer decision, which led to Taylor's resignation. As such, because Taylor has not shown that Turner and Rogers knew of the intake questionnaire prior to directing his transfer and Taylor's resignation, he has not shown that any protected conduct and the alleged adverse employment action were in any way related. Thus, Taylor's retaliation claim on his transfer order and resignation must fail.

### c.  Taylor's complaint to Hill was too temporally distant from the first alleged discriminatory act to show causation.

Taylor argues that the Board undertook allegedly adverse employment actions against Taylor because of a verbal internal complaint to Hill. Taylor complained verbally to Hill in December of 2008 that he was being discriminated against because of his race. However, the first allegedly retaliatory act occurred when he was suspended approximately six months later. This long time span defeats causation. Because the first alleged retaliatory act was more than three months after the protected conduct, and because all of the other alleged retaliatory acts naturally occurred more than three months after Taylor's protected conduct, Taylor cannot show causation, and his retaliation claim for his complaint to Hill fails. *Thomas*, 506 F.3d at 1364.

### d.  Taylor cannot show that, but for his protected conduct, he would not have been subjected to the allegedly adverse employment actions.

Turner has failed to submit evidence from which a reasonable jury could conclude that any of the allegedly adverse employment actions would not have taken place but for protected activity occurring before the action. *Nassar*, 133 S. Ct. at 2534. Therefore, Taylor's Title VII retaliation claim fails.

### B.  Taylor's § 1981 Claims

Courts use the same *McDonnell Douglas* burden-shifting for § 1981 claims as it does for Title VII claims. *Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998). Violations of § 1981 require a showing of discriminatory intent. *Dunklin v. Montgomery Cnty. Bd. Of Educ.*, 652 F. Supp. 2d 1226, 1235 (M.D. Ala. 2009).

### 1.  Count XI

In Taylor's eleventh count of his Second Amended Complaint, entitled "Plaintiff Stacy D. Taylor's Claims of Race Discrimination and Racial Harassment in Violation of the Fourteenth Amendment and 42 U.S.C. § 1981 (Asserted via 42 U.S.C. § 1983) against Chief Jeff Rogers, Stan Goolsby, Jean Turner and Kenneth Davis in their Individual Capacities", he alleges that "Chief Rogers, Jean Turner and Stan Goolsby engaged in race discrimination and racial harassment of Plaintiff Stacy D. Taylor." (Doc. # 6 ¶ 204.) Goolsby and Davis have since been

dismissed from this case in their individual capacities. (Doc. # 26.) As such, the claim only applies to Turner and Rogers. For the following reasons, the ABC Board's Motion for Summary Judgment on Taylor's Count XI is due to be **GRANTED**.

### a. Taylor's Response to the Board's Motion for Summary Judgment is an inappropriate place for trying to reinstate Goolsby as an individual defendant.

Taylor attempts to reinstate Goolsby as an individual defendant through his Response Brief to the Board's Motion for Summary Judgment. "[A] plaintiff cannot amend his complaint through argument made in his brief in opposition to the defendant's motion for summary judgment." *Miccosukee Tribe*, 716 F.3d at 559. "'At the summary judgment stage, the proper procedure for plaintiffs to assert a new claim is to amend the complaint in accordance with Fed. R. Civ. P. 15(a).'" *Id.* (quoting *Hurlbert v. St. Mary's Health Care Sys., Inc.*, 439 F.3d 1286, 1297 (11th Cir. 2006)). As stated in *Miccosukee Tribe*, Taylor's attempt to amend his complaint through his brief is invalid. Furthermore, the time for amending the pleadings expired in 2012. (Doc. # 46 at 2.) Finally, this court sees no reason to allow Taylor's request to stand; he has waited until almost two years after Goolsby was dismissed and more than two months after Goolsby was deposed. Furthermore, Taylor has not offered any excuse for his delay. Finally, he waited until two months prior to the first date of trial to ask the court to reinstate Goolsby. This is not the kind of diligence that might allow for an amended pleading after the deadline for adding parties has passed. *Romero v. Drummond Co.*, 552 F.3d 1303, 1319 (11th Cir. 2008). Thus, Taylor's attempt at reinstating Goolsby in this case fails.

**b.  Taylor does not contend that there is any claim against Turner for a discriminatory failure to promote or discriminatory work assignments, nor has he shown any evidence linking Turner to his June 2009 suspension.**

In the Second Amended Complaint, Taylor raised failure to promote and discriminatory work assignment § 1981 claims against Turner in her individual capacity through § 1983. (Doc. # 6 ¶ 204.) Taylor has failed to present any evidence that would justify considering this claim. Moreover, in his brief, Taylor writes that he "voluntarily dismisses any promotion claim against Lieutenant Turner to the extent [the] complaint can be construed to contain one." (Doc. # 138 at 43.) Furthermore, he writes that he dismisses this claim because "it is undisputed that Chief Rogers made the decision to assign the supervisory duties at issue in these claims." (*Id.*) Finally, as the Board points out, Taylor does not provide any evidence that Turner was involved with his driving or warehouse assignments. In fact, the only evidence presented shows that the warehouse assignments were given by Hill. (Doc. # 137-1 at 44:12–20.) In addition, Hill was Taylor's supervisor when Taylor was assigned to drive the African-American captain and when Taylor complained about driving the African-American senator. (Doc. # 137-1 at 289:13–17; 62:1–4.) There is no evidence linking Turner to these assignments. Thus, Turner is entitled to summary judgment for both the failure to promote and discriminatory work assignments claims in this case.

Furthermore, Taylor presents no evidence linking Turner to the June 2009 suspension for failing to report an unusual incident. A plaintiff must show that the state actor defendant was causally linked to the discrimination. *See Page v. Winn-Dixie Montgomery, Inc.*, 702 F. Supp. 2d 1334, 1355–56 (S.D. Ala. 2010). Because Taylor has not presented any evidence of a link between Turner and his suspension in response to the Board's showing that Turner was not

81

involved with the decision in any way, Taylor's § 1983 claim against Turner for the discriminatory suspension fails.

### c.   Taylor's other discriminatory discipline claims against Turner fail.

For the same reasons discussed above, Taylor's other discriminatory discipline claims fail, and thus they also fail as against Turner. In particular, Taylor did not identify any adequate comparators that were treated more favorably. In addition, in several instances, Taylor did not argue or adequately show an adverse employment action. Moreover, Taylor has not argued or pointed to any evidence indicating racial animus when Turner was making her disciplinary decisions. Finally, Taylor has not rebutted Turner's legitimate, nondiscriminatory reasons for the discipline: such as, for example, the low number of cases made by Taylor. Because Turner's reasons for disciplining Taylor were legitimate and nondiscriminatory, the burden shifts to Taylor to show that the proffered reasons were pretext. However, Taylor does not present any argument contesting the validity of the Board's proffered statistics. Thus, the undisputed evidence is that Taylor made fewer cases than Barber. Moreover, Taylor does not argue against any of Turner's other reasons for disciplining Taylor.

For all of these reasons, Taylor's other discriminatory discipline claims fail, and Turner is entitled to summary judgment on all claims under Count XI.

### d.   Taylor has not shown any racial intent in connection to his discriminatory driving and warehouse assignments claims.

Taylor fails to show any racial intent in arguing his discriminatory work assignments claim, including with regards to Rogers. As discussed above, the undisputed evidence is that all ABC agents, regardless of race, have to work in the ABC warehouse for security reasons and undertake driving assignments. Taylor has not presented any evidence of discriminatory treatment by Rogers. Apart from bald assertions, he does not point to any evidence of more favorable treatment for white agents in making such assignments. He has not shown any evidence of white workers having to work less in the warehouse than him or having to drive less than him. Thus, in the face of Rogers' well-supported Motion for Summary Judgment, Taylor has failed to connect any of the alleged discriminatory work assignments with any indication of racial animus, and his § 1981 claim against Rogers for discriminatory work assignments fails.

*1. Taylor has not rebutted Chief Rogers' legitimate, nondiscriminatory reason for the differing assignments.*

Rogers says that he provided additional duties to Chandler and Wilson because of their respective levels of expertise. In particular, Wilson had experience with managing the Board's equipment needs. Also, Chandler had experience with information services, and, to Rogers, Chandler was the type of agent who consistently showed initiative and drive. (Doc. # 137-5 at 112:17-22.) Based on these reasons, Rogers assigned them additional duties to cover for a vacancy created when Phillip Calvert was reassigned to a new position in a different office. In contrast with these arguments, Taylor only states that Rogers manipulated the system when he wanted a promotion to be made. While arguably true, this contention does not specifically address Rogers' legitimate, nondiscriminatory reason. *Chapman*, 229 F.3d at 1030. Furthermore, Taylor has not presented any evidence that the real reason Rogers did not give the work

assignments to Taylor was race discrimination. He has not shown that African-Americans with similar qualifications did not receive similar treatment.[12] As such, even if he might somehow be able to show that the proffered reason was false, he cannot show that race discrimination was the real reason. *Reeves*, 530 U.S. at 148–49.

Taylor mentions a promotion that occurred after he resigned as being evidence of pretext. However, all Taylor says is that this agent, Roberts, was promoted without an open and competitive process and that the agent was promoted due to Rogers giving him a title on his application. This reasoning is both unsupported by evidence and of minimal importance to Taylor's other assignments claims. First, there is no evidence that Roberts was promoted because he was able to list a higher title on his application. Taylor has presented no evidence of how Roberts' application was graded or what factors went into the decision to promote him. Second, even if the SPD did promote Roberts based on this title, Taylor still has not demonstrated that racial discrimination was the real reason that Rogers gave Roberts this title. Thus, as a result, this argument is both unsupported by evidence and of minimal importance, and as such Taylor's argument for pretext fails.

   2.  *For the same reasons as his Title VII claim, Taylor's § 1983 claim against Rogers for the discriminatory 2009 suspension fails.*

---

[12] Taylor does point out that, on the Certificate of Eligibles where Chandler was promoted from sergeant to lieutenant and on the Certificate where Wilson was promoted from sergeant to lieutenant, both Chandler and Wilson were last on the list while an African-American was at the top of the list. This still fails to show any racial animus in choosing Wilson and Chandler over Taylor. Their relative levels of experience were exact matches for what Rogers wanted in the positions. Ultimately, the same final issue applies: Taylor was not on the Certificate of Eligibles, he has not shown any evidence that he would have been under any circumstances, and as such he cannot show that Rogers discriminated against him.

As discussed above, Taylor has not satisfied the prima facie case for his 2009 discriminatory suspension claim. Taylor has not identified any valid comparators, much less ones outside of the protected class who received more favorable treatment. Because Taylor has not met his prima facie case for discriminatory discipline with his 2009 suspension, Taylor's § 1983 claim against Chief Rogers fails, and Rogers' Motion for Summary Judgment on that claim is due to be **GRANTED**.

### 3. *Taylor's other disparate discipline claims against Rogers fail.*

Taylor has not shown any evidence of intentional race discrimination in any of Rogers' disciplinary decisions. As a result, Taylor fails to link race discrimination and Rogers' decision to approve the December 2009 transfer, and this claim fails. Furthermore, Taylor has not provided any evidence that Rogers was involved in any way with the November 2009 written warning concerning Taylor's state-issued vehicle. Finally, Taylor has not provided any evidence of Rogers' involvement with the December 2009 warning for Taylor's failure to perform his job. Because Rogers moved for summary judgment on these issues, and because Taylor did not present any evidence to counter Rogers' well-supported arguments, Rogers' Motion for Summary Judgment on his disparate discipline claims is due to be **GRANTED**.

### e. The court assumes that Taylor's promotion claim against Rogers is not barred by the four-year statute of limitations assumed to be applicable to this case.

Claims against state actors for violations of § 1981 must be brought through § 1983. *Baker v. Birmingham Bd. of Educ.*, 531 F.3d 1336, 1337 (11th Cir. 2008). A two-year limitations

period applies to § 1983 actions in Alabama. *Id.* (citing *Jones v. Preuitt & Mauldin*, 876 F.2d 1480, 1483 (11th Cir. 1989)). But, "a four-year statute of limitations applies to 'civil action[s] arising under an Act of Congress enacted after' December 1, 1990." *Id.* (quoting 28 U.S.C. § 1658(a)) (alteration in original). If a § 1981 claim was made possible through the enactment of the 1991 amendments to § 1981, then those claims are governed by the four-year statute of limitations. *Id.*

Without analyzing this issue, the court will assume, without deciding, for the purpose of resolving this motion, that the four-year statute applies.

### f.   Taylor's promotion claim against Rogers concerning Wilson and Chandler fails.

Although the court assumes that Taylor's § 1981 promotion claim against Rogers is not time-barred, it fails for other reasons. The analytical framework and elements of claims under § 1981 are identical to those of Title VII. *Standard*, 161 F.3d at 1330. First, Taylor's claim fails because he has not presented any evidence of racial animus in deciding to promote Chandler and Wilson. Specifically, Taylor has not argued or offered any evidence supporting a finding that the Chandler and Wilson were promoted because they are white. Taylor also has not shown evidence supporting a finding that he was not promoted because he is African-American. To the contrary, and as discussed above with Chandler and Wilson's assignments, Rogers proffered Chandler and Wilson's relative qualifications as legitimate, nondiscriminatory reasons for assigning different duties. For the same reasons that Rogers assigned duties to Chandler and Wilson, he also promoted them to sergeants. Because Taylor has not rebutted the legitimate, nondiscriminatory

reasons for Rogers assisting with Chandler and Wilson's promotions, and because Taylor has not shown any racial animus with these promotions, Taylor's claim fails.

## 2.  Count XII

In Taylor's Count XII of the Second Amended Complaint, entitled "Plaintiff Stacy D. Taylor's Claims of Retaliation in Violation of [] 42 U.S.C. [§] 1981 (Asserted via 42 U.S.C. § 1983) against Chief Jeff Rogers, Jean [Turner], and Stan Goolsby in their Individual Capacities", he alleges "Chief Jeff Rogers, Jean Turner and Stan Goolsby [violated 42 U.S.C. § 1981] by retaliating against Plaintiff Taylor in discipline, job assignments, strict scrutiny and constructive discharge." (Doc. # 6 ¶ 206.) Goolsby has since been dismissed from this case in his individual capacity. (Doc. # 26) As such, the claim only applies to Turner and Rogers. In his brief, Taylor asserts that he is accusing Turner and Rogers of intentional discrimination, but only Goolsby of retaliation. (Doc. # 138 at 2.) Furthermore, Taylor points to no other evidence, nor does he make any argument, accusing Rogers or Turner of retaliation. Thus, Taylor has failed to meet his burden on his retaliation claims against Rogers and Turner, and their Motions for Summary Judgment on Taylor's Count XII is due to be **GRANTED**.

## V.    CONCLUSION

The court has carefully considered the voluminous briefs and evidence submitted by all parties. Having done so, while there are disputes as to some facts, the court concludes that the

Defendants have established that there is no genuine dispute as to any material fact and that all Defendants are entitled to judgment as a matter of law.

For the reasons discussed, the Defendants' Motions for Summary Judgment are **GRANTED**.

Done this 23rd day of September, 2013.

/s/ W. Harold Albritton
W. HAROLD ALBRITTON
SENIOR UNITED STATES DISTRICT JUDGE

88